STATE of Utah, Plaintiff and Appellee,

v.

Gary D. HILFIKER, Defendant and Appellant.

No. 930176–CA.

Court of Appeals of Utah.

Jan. 21, 1994.

---

Joan C. Watt (argued), Salt Lake Legal Defender Ass'n, Salt Lake City, for defendant and appellant.

Jan Graham, State Atty. Gen., Joanne C. Slotnik (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before BENCH, JACKSON and RUSSON, JJ.

## OPINION

JACKSON, Judge:

Defendant Gary Hilfiker was charged with murder and aggravated arson, both first degree felonies. Defendant appeals the trial court's denial of two motions to suppress statements and evidence. We affirm.

## FACTS

Early in the morning of April 24, 1992, firefighters were dispatched to a residence on fire. Firefighters found the body of Marsha Haverty near a hole burned through the floor in the front room area of the house. The hole had been created by the fire in a way that suggested the use of a fire acceler-

ant. One of the firefighters also found a knife covered with blood on the lawn near the house. Medical testimony later established that Haverty "had been stabbed and cut numerous times on the chest and her face and her back" and that she probably bled to death before the fire started.

When the police first arrived on the scene, defendant, who had been living with Haverty at the residence for a short period of time, was "quite excited and screaming something about some—the possibility of somebody being inside the house." Jody Whitaker, a Salt Lake City police officer, noticed that defendant's right hand was cut and bleeding. Defendant had blood on his shirt, shoes, and socks. Whitaker escorted defendant to an ambulance and followed him to the hospital. While defendant's hand was being stitched, Whitaker asked defendant what had happened. Defendant told the officer that he cut his hand breaking a window. A fire investigator also went to the hospital and asked defendant about the cause of the fire.

Shortly after defendant arrived at the hospital, Robin Howell, the detective in charge of the case, arrived at the scene of the fire. For about an hour, Howell toured the scene, gathering information. He discovered or was shown two similar jackets with blood on them, blood on three vehicles and on the house, a kitchen knife with blood on it, the body of Haverty, and the suspicious burn pattern. He learned that defendant lived in the house and that there had been no signs of forced entry into the home. He also knew that defendant had been taken to the hospital and that during the brief questioning there, defendant gave an inadequate explanation of his whereabouts for a two-hour period earlier that morning.

When defendant was finished at the hospital, Whitaker offered him a ride home. On the way, Whitaker received a call from Howell requesting that defendant be transported to the public safety building. Whitaker later testified that this was standard procedure for questioning a witness. According to Whitaker, defendant became "quite excited," and stated that "he was positive that they found her inside dead, and they'd think he did it." Defendant also stated that "he was quite

tired, and that he wanted to go home and get some sleep," but that "he'd be willing to talk to somebody." Whitaker and defendant arrived at the public safety building and waited together for Howell. While waiting, Whitaker began writing up his report. Shortly thereafter, Howell arrived and asked Whitaker and defendant to move to an interview room. During the next ten minutes, Howell obtained written permission from defendant to search his residence. After informing the officers at the scene that they may proceed with the search, Howell returned to the interview room. There, Howell read defendant his *Miranda* rights and started asking him questions. Defendant made no inculpatory statements, but failed to dispel Howell's suspicions concerning defendant's whereabouts from 1:30 to 3:30 a.m. and the absence of any singed hair, which Howell believed defendant would have had if defendant entered the burning home as he stated earlier. Howell then turned the interview over to detective James Alcock who sought clarification of "some discrepancies in the statement, vagueness of time, places, names, such things as that." About an hour and a half later, the tape being used to record the interview ran out. When Alcock turned the tape over, he repeated the *Miranda* rights to the defendant who again consented to talk with the detective. Approximately twenty minutes later, Alcock discussed the possibility of obtaining defendant's clothing and providing him with something else to wear. According to Alcock, Defendant agreed to the exchange. Alcock then requested permission to draw blood from defendant for comparison purposes. At this time, defendant requested counsel. Alcock later testified that he then "terminated the interview." Detective David Timmerman, who had entered the interview room minutes earlier, explained to defendant that it was his request for an attorney that triggered the termination of the interview.

Upon termination of the interview, defendant stated he was hungry and Alcock took him to the cafeteria. Alcock conversed with defendant while he ate but did not question him. Several minutes after returning defendant to the interview room, Alcock reappeared for defendant's clothing. At this

time, according to Alcock's testimony, defendant stated, "I want to tell you what really happened last night. I can't live with this anymore." Alcock then left the room to get a tape recorder and tapes. He returned and reaffirmed defendant's *Miranda* rights, specifically reminding him of his right to an attorney. Defendant acknowledged that he was talking to Alcock "by my choice." Defendant then admitted to stabbing Haverty and setting the house on fire to cover up what he had done.

Defendant was charged with murder and aggravated arson, both first degree felonies. Defendant filed a "Motion to Suppress Statements and All Evidence Secured Through Unlawful Arrest," and a "Motion to Suppress Defendant's Statement to Police." Following a hearing, the trial judge denied the motions. Defendant was tried and convicted by a jury.

## ISSUES

The issues presented in this case are first, whether defendant's statements were made after unlawful detention in violation of his Fourth Amendment rights thus requiring suppression, and second, whether defendant's statements, made after he invoked his right to counsel, were admissible.

## ANALYSIS

■ The United States Supreme Court has held that a police officer must have probable cause to detain an individual for custodial questioning. *Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979). Defendant argues that he was held in custody without probable cause in violation of the Fourth Amendment and that his subsequent statements should be suppressed under the exclusionary rule. We disagree. Probable cause existed before defendant was taken into custody.

■ The Utah Supreme Court in *State v. Wood*, 868 P.2d 70, 82, 229 Utah Adv.Rep. 12, 17–18 (1993) recognized the following four

factors for determining whether one is "in custody" before a formal arrest is made: (1) the site of the interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of the interrogation.[1]

■ Defendant claims he was in custody from the time he left the scene of the fire. However, defendant was alone in the ambulance on the way to the hospital for treatment. He was not in the presence of a police officer until he arrived at the hospital. There, Whitaker questioned him generally as to what happened. However, Whitaker's undisputed testimony is that he considered defendant to be a witness, not a suspect. There were no objective indicia of arrest at the hospital. In fact, when Whitaker received the call to take defendant to the public safety building, he was giving defendant a ride home. Thus, at the time of the call, defendant was not in custody.

The trial court's findings indicate that at the time of the call probable cause existed for the purpose of custodial questioning. Probable cause is an objective determination based on "whether from the facts known to the officer, and the inferences which fairly might be drawn therefrom, a reasonable and prudent person in his position would be justified in believing that the suspect had committed the offense." *State v. Bartley*, 784 P.2d 1231, 1236 (Utah App.1989) (quoting *State v. Cole*, 674 P.2d 119, 125 (Utah 1993). Probable cause does not require certainty, but a rationally based conclusion of probability. *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). The trial court's "findings as to the facts and circumstances pertaining to probable cause will not be overturned on appeal unless it appears that the trial court clearly erred." *State v. Dorsey*, 731 P.2d 1085, 1088 (Utah 1986).

The trial court found that at the time officer Whitaker was told to take defendant

1. In *State v. Sampson*, 808 P.2d 1100, 1105 (Utah App.1991) *cert. denied*, 817 P.2d 327 (Utah 1991) and *Utah v. Sampson*, —— U.S. ——, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992), the court of appeals recognized a fifth factor: "whether the

defendant came to the place of interrogation freely and willingly." The supreme court in *Wood*, however, recently stated that this was "not truly an additional factor." *Wood*, 828 P.2d at 82 n.3.

down to the public safety building, he was giving defendant a ride home, not holding him in custody. At that time Howell had been at the scene of the fire for approximately one hour. He had been shown the body and the knife found outside the home with blood on it. He knew that two jackets, which appeared to have blood on them, had been found. He also knew that blood had been found on three vehicles and on the outside of the home. Howell knew that defendant lived at the home and that there were no signs of forced entry. He also knew that when defendant was asked what had happened, he gave an inadequate account of his whereabouts for a two-hour period earlier that morning. Based on our review of the record, we hold that these findings were not clear error. Further, Howell was justified in believing defendant had committed a crime when he told Whitaker to take defendant to the public safety building. Accordingly, probable cause to detain defendant existed when Whitaker was told to bring defendant to the public safety building, which, as we have noted above, was before defendant was in custody.

## Statements Made After Right to Counsel Invoked

■ The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The Supreme Court determined in *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), that this privilege is best protected by informing individuals of certain rights before conducting a custodial interrogation. One such right is the "right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S.Ct. at 1612. Once a person indicates in any manner that he or she wishes to speak to an attorney, there can be no further questioning. *Id.* at 444–45, 86 S.Ct. at 1612–13. Defendant does not dispute that the questioning ceased after he invoked his right to counsel. He argues that although the officers may have stopped direct questioning, their actions "in continuing to hold [him] and attempting to obtain items of evidence from him created the same atmosphere as that

which is created by custodial questioning." We disagree.

Interrogation under *Miranda*
refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (footnote omitted). The interview ceased when defendant requested counsel. At that time, one of the detectives present explained that the interview was terminated because of defendant's request for counsel. Additionally, we find no words or actions on the part of the police that would be reasonably likely to elicit an incriminating statement.

■ Statements made by a person after invoking the right to counsel are admissible if (1) the accused, not the law enforcement officers, initiates the conversations in which the incriminating statements are made; (2) the prosecution shows a knowing and intelligent waiver of accused's right to counsel; and (3) the prosecution shows by a preponderance of evidence that the statements were voluntarily made. *State v. Moore*, 697 P.2d 233, 236 (Utah 1985).

Defendant initiated the conversation in which he incriminated himself. After the interview ceased, defendant stated he was hungry. Alcock accompanied defendant to the cafeteria where defendant ate breakfast. Alcock conversed with defendant but did not question him, and the defendant made no incriminating statements at that time. Alcock brought defendant back to the interview room and left him there alone. After a few minutes, detective Alcock went down to the evidence room where he "took some time" locating clothes suitable to replace those he intended to obtain from defendant. Alcock returned to where defendant was and may have addressed him to get his attention. However, such "inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversa-

tion." *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). At this point, defendant volunteered, "I want to tell you what really happened last night. I can't live with this anymore." The record confirms that this statement was not made in response to anything Alcock said or did, but was the initiation of a separate conversation by defendant.

■ Defendant's waiver of his right to counsel was also knowing and intelligent. *See Moore,* 697 P.2d at 236. The determination of knowing and intelligent waiver depends "upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused." *Id.* (quoting *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983)). Waiver need not be express and may be inferred from a defendant's acknowledgement of the understanding of his or her rights and defendant's subsequent course of conduct. *State v. Hegelman,* 717 P.2d 1348, 1349 (Utah 1986). In the case before us, defendant was informed of his *Miranda* rights immediately after stating his desire to "tell ... what really happened." Alcock stated, "I want to make it clear here ... that you're still under *Miranda,* you have requested an attorney, ... if you wish to make a statement, we'll listen to it.... I want you to understand that you still have that right to an attorney." Defendant replied that he wished to make a statement, and went on to incriminate himself. He acknowledged his rights and still proceeded to make the incriminating statements. Given that his confession was made immediately after being informed of his rights for the third time and after being reminded that he still had the right to an attorney, we find his waiver to be knowing and intelligent.

■ Finally, defendant made the incriminating statements voluntarily. The test for voluntariness "is never mechanical, but must duly consider both the characteristics of the accused and the details of the interrogation." *State v. Allen,* 839 P.2d 291, 300 (Utah 1992). The ultimate inquiry is "whether physical or psychological force or other improper threats or promises prompted the accused to talk when he otherwise would not have done so." *Id.* Just prior to confessing, defendant stated that he was making a statement "by my choice." Defendant also stated he was "tired," and "sick of sitting there." This does not mean, however, that the police intentionally applied "physical or psychological force or manipulation that [was] designed to induce the accused to talk when he would not otherwise have done so." *State v. Moore,* 697 P.2d 233, 237 (Utah 1985). Any questioning of a suspect by police officers "will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspects to be charged with a crime." *State v. Meinhart,* 617 P.2d 355, 357 (Utah 1980). Nothing in the record suggests any intentional conduct on the part of the police or any aspect of the investigation that could be considered as designed "physical or psychological force or manipulation," vitiating the voluntariness of defendant's inculpatory statement. We therefore conclude the statements were voluntary.[2]

## CONCLUSION

At the time defendant was taken to the public safety building, there was probable cause to detain him for custodial questioning. After defendant invoked his right to counsel, he initiated a conversation in which he incriminated himself. His waiver of his right to counsel was knowing, intelligent, and voluntary. Accordingly, we affirm.

BENCH, J., concurs.

RUSSON, J., concurs in result.

---

2. Defendant makes that additional argument that his inculpatory statements should have been suppressed because they were taken in violation of his Sixth Amendment right to counsel. "The Sixth Amendment right to counsel attaches at the initiation of adversary judicial criminal proceedings, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *State v. Wood,* 868 P.2d 70, 86 (1993) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)). When defendant incriminated himself, his Sixth Amendment right to counsel had not yet attached.