**STATE of Utah, Plaintiff and Appellee,**

v.

**Brandon A. DAHLQUIST, Defendant and Appellant.**

**No. 950757–CA.**

Court of Appeals of Utah.

Jan. 24, 1997.

Kent E. Snider, Ogden, for Appellant.

Jan Graham, Attorney General, and J. Kevin Murphy, Assistant Attorney General, Criminal Appeals Division, Salt Lake City, for Appellee.

Before WILKINS, Associate P.J., and BILLINGS and ORME, JJ.

ORME, Judge:

Defendant Brandon Dahlquist appeals his conviction for murder, a first degree felony under Utah Code Ann. § 76–5–203(2) (Supp. 1996).[1] We reverse and remand for a new trial.

## FACTS

On March 12, 1994, Troy Weston's body was found at the south end of Willard Bay in Box Elder County. Earlier that morning, a distinctively-painted, white and maroon Chevy Blazer had appeared at Weston's home. Weston's father noted two males in the Blazer. At approximately 10:00 a.m., Weston joined the two men and left in the Blazer.

Later that morning, codefendant Travis Telford's sister saw Dahlquist, Telford, and an unknown male in Dahlquist's Blazer near Godfather's Pizza in Ogden. Dahlquist, Telford, and their passenger drove off together around 11:30 a.m.

Around noon, Air Force Captain Michael Chulick was driving to the south Willard Bay area to exercise his dogs when he encountered a "white and brown" Chevy Blazer parked in the road. While driving around the Blazer, Captain Chulick saw three Caucasian males in the vehicle. As Captain Chulick began exercising his dogs some distance away, he heard periodic gunshots near the

1. Dahlquist was charged jointly with Travis Telford for the March 12, 1994 murder of Troy Weston. A jury found both defendants guilty as charged, finding additionally that a firearm had been used to commit the murder.

Blazer. Captain Chulick observed "two people run to the vehicle and then run away from the vehicle and then back to the vehicle and peel out." He walked toward where the Blazer had been parked and noticed what appeared to be targets set up for shooting practice. He testified that these "targets" included a soda bottle, a cleanser bottle, a cigarette box, and a Chips Ahoy cookie box. Captain Chulick, seeing nothing amiss, departed. Later that afternoon, Judy and Dee Spinden were walking their dog in the area when they discovered the body of Troy Weston in a ditch. The Spindens immediately notified the police.

In their investigation, the police found several used .22 caliber casings on the road near the location where Weston's body was found. Six .22 caliber slugs were recovered from Weston's body. The Chips Ahoy cookie box bore a thumbprint from Dahlquist and a fingerprint from Telford.

Several days after the murder, the police located the Blazer, which was owned by Dahlquist's father. It had been painted gray by an acquaintance of Telford. Inside the Blazer, the police found the top of the Chips Ahoy cookie box that had been found at the murder scene.

On March 14, 1994, Dahlquist was arrested on a bench warrant for an unrelated forgery charge. The next day, the following interview was conducted by Detective Dale Ward: [2]

[WARD:] Were at the Box Elder County Sheriff's Office. The date is 3/15/94 present are Deputy's DaleWard and Jim Summerill and Brandon Dalquist. Is that correct Brandon?

[DAHLQUIST:] Yes.

[WARD:] Uh, what is your date of birth Brandon?

[DAHLQUIST:] August 10th, 74.

[WARD:] Ok, and do you have a social security number?

[DAHLQUIST:] [social security number stated]

[WARD:] Ok. Um, Brandon were going to visit with you on acouple of matters and and uh before we do that I think we should advise you of your rights.

[DAHLQUIST:] Yes, I would like a lawyer present.

[WARD:] You would like a lawyer present?

[DAHLQUIST:] Yep.

[WARD:] Ok, now let me read you your rights and well get to that part. You have the right to remain silent anything you say can be used against you in a court of law, you have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before your are questioning if you wish one. Do you understand? You can refuse to answer any questions and or stop giving this statement any time you want to.

[DAHLQUIST:] Yes.

[WARD:] You understand that? Do you understand each of these rights as I have explained them to ya?

[DAHLQUIST:] Yes.

[WARD:] Ok, having these rights in mind, do you wish to talk to us at this time?

[DAHLQUIST:] Uh, with a lawyer present.

[WARD:] Ok. Would you just sign that for me right there.

[DAHLQUIST:] What am I being questioned about?

[WARD:] We wanted to discuss the situation with you about Troy Weston. Ok, well, um, you probably already know that he is deceased?

**2.** We quote, essentially verbatim, from the transcript of the recorded interview, including errors in punctuation and spelling. A tape recording of the interview is in our record. The quality is not good, but the transcript of the recording appears to be complete and reasonably accurate.

[DAHLQUIST:] Yes I know. I don't know anything about that.

[WARD:] And he, thats what we wanted to question you about. But uh you've involked your lawyer privilege so, uh we can't ask you any questions but

[DAHLQUIST:] To be on the safe side.

[WARD:] but I would like to advise you of acouple things and then um, one of the things that I need to advise you of is that the morning of, Saturday morning the day that that Troy came up missing, you were identified as being at the home not once but twice.

[DAHLQUIST:] I picked him up that morning.

[WARD:] Ok. You also need to know that you and your vehicle were identified at the scene of the crime.

[DAHLQUIST:] Shouldn't of been. I I would don't would like a lawyer.

[WARD:] Ok. And the interview will end. The time is 10:28 AM.

On March 31, 1994, warrants were issued for the arrests of Dahlquist and Telford for the murder of Troy Weston. Thereafter, while serving time in prison on the unrelated forgery charge and awaiting his trial for murder, Dahlquist became acquainted with a fellow inmate. According to the inmate, Dahlquist admitted to him that he took Weston to Willard Bay and killed him because he "was a rat." Dahlquist allegedly confided to the inmate that Telford had "spilled his guts" about the murder and was trying to place the primary blame on him.

On August 31, 1994, Dahlquist moved to suppress his statement to Detective Ward on the ground that it was obtained in violation of *Miranda* and his Fifth Amendment right to have counsel present during custodial interrogation. The trial court denied Dahlquist's motion. Subsequently, Dahlquist's trial counsel obtained a copy of an audio recording of Dahlquist's statement. Based upon additional information allegedly found on the audio recording,[3] a second motion to suppress was made. The trial court again denied Dahlquist's motion.

After the State decided to try Dahlquist and Telford jointly, Dahlquist filed a motion to sever the trial. The trial court denied the motion, but ordered that any statements by Telford could be used only against him, and not against Dahlquist, since Telford would not testify and thus could not be cross-examined by Dahlquist. Later, the court ordered that the pretrial statements made by Telford be redacted to exclude any reference to Dahlquist's name or existence. Subsequently, counsel for Dahlquist and Telford filed a joint request to sever their trials. The trial court denied the joint motion to sever.

Dahlquist and Telford were tried before a jury. The jury found Dahlquist guilty of one count of first degree murder, with a firearm enhancement. He now appeals.[4]

## ISSUES ON APPEAL

Dahlquist contends that his Fifth and Fourteenth Amendment rights to counsel, due process, and freedom from self-incrimination were violated when the trial court failed to suppress his statement to Detective Ward. Dahlquist also argues that his Sixth and Fourteenth Amendment rights to confrontation were violated when the trial court failed to sever his trial from that of his codefendant, a problem he claims was not cured by admitting codefendant Telford's out-of-court statements as evidence only against Telford. Dahlquist asserts that his Sixth and Fourteenth Amendment rights to

**3.** Dahlquist contended that the audio recording reveals a twenty-four second lapse of time between communication by Dahlquist and Detective Ward that evidences improper interrogation tactics. In addition, Dahlquist claimed that Detective Ward recognized Dahlquist's request for counsel and told him that he could not question him further, but then continued to speak with Dahlquist in such a manner as to exploit the situation and cause Dahlquist to make a statement without his counsel present.

**4.** Telford was also convicted of first degree murder, with a firearm enhancement, and has taken a separate appeal.

confrontation were also violated by the closing arguments of codefendant's counsel. Finally, Dahlquist contends the trial court erred when it enhanced his prison sentence by an indeterminate term of one to five years, based upon the use of a firearm.

## *MIRANDA* VIOLATION

■ In seeking a new trial, Dahlquist claims Detective Ward failed to honor the invocation of his right to the presence of an attorney as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "When a trial court bases its 'ultimate conclusions concerning the waiver of defendant's *Miranda* rights ... upon essentially undisputed facts, in particular the transcript of [an officer's] colloquy with defendant,' its conclusions present questions of law which we review under a correction of error standard." *State v. Gutierrez,* 864 P.2d 894, 898 (Utah App.1993) (quoting *State v. Sampson,* 808 P.2d 1100, 1103 (Utah App.1990), *cert. denied,* 817 P.2d 327 (Utah 1991), *cert. denied,* 503 U.S. 914, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992)).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, guaranties that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda,* the United States Supreme Court held that law enforcement officers must protect this privilege by informing an accused person of his or her constitutional rights before engaging in custodial interrogation. 384 U.S. at 444, 86 S.Ct. at 1612. Those rights include the right to have an attorney present. *Id.* Interrogation must cease if the accused invokes his or her right to consult with an attorney, and, with limited exceptions, the prosecution may not use any statements made by the accused taken in violation of *Miranda*'s protections. *Id. Accord Arizona v. Roberson,* 486 U.S. 675, 680–82, 108 S.Ct. 2093, 2097–98, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981).

In the instant case, it is undisputed that Dahlquist invoked his right to consult with an attorney several times during the interview with Detective Ward. However, the State contends that Dahlquist initiated the portion of the conversation that culminated in his incriminating admission that he had picked up Troy Weston on the morning of his murder by asking, "What am I being questioned about?"

■ A defendant who has invoked his right to counsel but has not yet received the benefit of counsel will not be held to have then relinquished that right unless he is responsible for initiating further discussion with law enforcement personnel. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. In order for a defendant to initiate a conversation with authorities that will be held to constitute a willingness to talk about the charges without counsel, he or she must indicate a desire " 'to open up a more generalized discussion relating directly or indirectly to the investigation.' " *State v. Moore,* 697 P.2d 233, 236 (Utah 1985)(quoting *Oregon v. Bradshaw,* 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983)(plurality opinion)).

In this case, defendant initiated no such open-ended conversation. After invoking his right to counsel, he merely asked what he was being questioned about. That question was succinctly answered and his invocation of the right to counsel was simultaneously acknowledged. There the matter should have been left until Dahlquist had counsel present or definitively waived his right to counsel, either expressly or by initiating a discussion relative to the substance of the investigation. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. Instead, the officer set about to "advise" Dahlquist, as though somehow required, of things which were not even true, but were apparently contrived by the officer, namely that he had been identified as being at Weston's house twice on the day of his death and that he had been identified as being at the scene of the murder. Instead of heeding his own recognition that he could not ask Dahlquist any questions, Detective Ward continued the conversation by "advising" Dahlquist, without request, of specific "facts" related to the investigation. In direct response, Dahlquist made the statement: "I picked him up that morning."

■ On these facts, Detective Ward's tactic was "reasonably likely to elicit an incriminating response from [Dahlquist]." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). By continuing the custodial dialogue after acknowledging that Dahlquist had invoked his right to consult an attorney, albeit in the form of a statement rather than a question,[5] Detective Ward violated Dahlquist's *Miranda* rights. Accordingly, the trial court erred when it refused to suppress Dahlquist's admission that he picked up Troy Weston, the victim, on the morning of the murder.

## PREJUDICIAL ERROR

■ Although it was error for the trial court to admit Dahlquist's statement, our inquiry is not complete. We must still decide whether the trial court's error in admitting Dahlquist's statement was harmless. "It is well established that the admission of statements obtained in violation of *Miranda* can be harmless error." *State v. Velarde*, 734 P.2d 440, 444 (Utah 1986). *See Harryman v. Estelle*, 616 F.2d 870, 875 (5th Cir.), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). For federal constitutional error to be held harmless, we must " 'sincerely believe that it was harmless *beyond a reasonable doubt.*' " *State v. Genovesi*, 909 P.2d 916, 922 (Utah App.1995)(emphasis added)(quoting *Scott v. State*, 86 Nev. 145, 465 P.2d 620, 622 (1970)). *Accord Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 826–27, 17 L.Ed.2d 705 (1967); *State v. Villarreal*, 889 P.2d 419, 425 (Utah 1995). Therefore, we will affirm Dahlquist's conviction only if we can honestly say, beyond a reasonable doubt, that Dahlquist would still have been convicted of murder even if the trial court had not admitted the incriminating statement. *See Genovesi*, 909 P.2d at 922.

■ In the instant case, the prosecution used Dahlquist's statement to place him with Weston on the morning of the murder.[6] Basically, we must decide whether other credible evidence placing the two together on the morning of the murder was before the jury[7] and, if it was, whether it is so compelling that we can conclude, *beyond a reasonable doubt,* that the jury would have reached the same verdict without learning of Dahlquist's incriminating statement. It is not enough that we would find sufficient evidence to support the conviction even if the statement is excised from the record. It is inconsequential that a retrial will most likely result in a conviction. "Beyond a reasonable doubt" requires the highest level of certainty known to our legal system in the resolution of a disputed factual matter. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)("[T]he reasonable-doubt standard is indispensable, for it 'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' ")(quoting Norman Dorsen & Daniel A. Rezneck, *In Re Gault and the Future of Juvenile Law*, 1 Fam. L.Q. 1, 26 (1967)); *State v. Haston*, 811 P.2d 929, 932 n. 3 (Utah App.1991)(explaining that on a certainty scale of 0–100, proof beyond a reasonable doubt should be "something like a 99"), *rev'd on other grounds*, 846 P.2d 1276 (Utah 1993).

---

5. It is inarguable that if the officer, after recognizing Dahlquist's invocation of his right to counsel, and noting his corresponding inability to ask Dahlquist questions, had asked: "Did you pick Weston up on the morning of the day he died?," any information offered in response would have to be suppressed. Legally, the result can be no different merely because the officer managed to phrase his language in declaratory rather than interrogatory form. *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 298–302, 100 S.Ct. 1682, 1688–90, 64 L.Ed.2d 297 (1980).

6. In the State's closing argument, the prosecutor specifically referred to Dahlquist's statement to Detective Ward that he picked up Weston on the morning of the murder.

7. Such evidence is pivotal because the main circumstantial evidence is comparatively weak. For instance, although Dahlquist's vehicle was at the murder scene, it was established that the vehicle was frequently borrowed and used by various of his friends and acquaintances. And while his thumbprint was found at the crime scene, it was found on a cookie box that had been in his car for some unknown period of time and could just as easily have been discarded at the crime scene by Telford as by him. Indeed, it could have been kicked out of the vehicle by someone else, whose fingerprint would not have been left on the box.

The State contends that Jennifer Colantonio, codefendant Telford's sister, identified Dahlquist with Weston near Godfather's Pizza on the morning of the murder. However, a review of her testimony indicates that she did not positively identify Weston as the other individual in the Blazer with Dahlquist and Telford. Moreover, on cross-examination, Ms. Colantonio admitted that when Detective Dave Hansen showed her the obituary photograph of Weston, she "had no recollection at all whether that picture was the person that [she] saw in the Blazer" on the morning of the murder.

The State also contends that Weston's father testified that two males in a vehicle matching the general description of Dahlquist's Blazer picked up his son on the morning of the murder. In addition, the State points to Captain Chulick's testimony that he saw three men who generally matched the description of Dahlquist, Telford, and Weston at the murder scene. However, neither of these two witnesses could positively identify Dahlquist.[8]

The State also introduced the testimony of a prison inmate acquainted with Dahlquist. The inmate testified that Dahlquist admitted to him that he took Weston to Willard Bay and killed him. The State urges us to conclude that the inmate's testimony proves Dahlquist's guilt, independent of his statement to Detective Ward.

However, we note that jailhouse confessions are routinely clouded with credibility issues, and thus must be examined closely for reliability. *See generally Coppola v. Powell,* 878 F.2d 1562, 1571 (1st Cir.), *cert. denied,*

493 U.S. 969, 110 S.Ct. 418, 107 L.Ed.2d 383 (1989). Such concerns are not of purely theoretical relevance in this case. The inmate testified he was "scared to death" in prison, having been raped during his stay. He admitted that he was doing everything he could to try and get out of prison. He testified that he was providing the prison authorities with information on other inmates on numerous matters, including a riot that had occurred at the prison. Additionally, the inmate admitted that he had lied to police in order to protect himself and had been charged with providing false information to a police officer. He acknowledged that he had been paroled earlier than scheduled, but claimed not to know why.

Given the issues raised regarding the inmate's credibility and the problematic identification testimony, we simply cannot conclude, beyond a reasonable doubt, that the error in admitting into evidence Dahlquist's incriminating statement to Detective Ward was harmless.

## CONCLUSION

Dahlquist's incriminating statement was an important link in the State's effort to place him with Weston on the morning of the murder. It was obtained in violation of his *Miranda* rights and should have been suppressed. Moreover, we are unable to conclude, beyond a reasonable doubt, that Dahlquist would have been convicted of the murder even if the trial court had not admitted Dahlquist's statement to Detective Ward into evidence. Because we are unable to

---

8. We recognize that a series of inferences could be drawn by the jury to place Dahlquist with Weston on the morning of the murder. First, Weston's father testified that two males in a distinctively-painted, white and maroon Chevy Blazer picked up his son at about 10:00 a.m. on the morning of March 12, 1994, the date of the murder. Second, Jennifer Colantonio, codefendant Telford's sister, testified that on a day in March 1994, during the later morning hours, she saw her brother and Dahlquist with an unknown male near Godfather's Pizza in Ogden in Dahlquist's Blazer. She was unable to specifically testify as to the exact date. However, Doug Cannon, Ms. Colantonio's bishop, testified that

he spoke with Ms. Colantonio on March 12, 1994, in the parking lot of Godfather's Pizza and noticed that she waved to a passing vehicle that she said contained her brother. Cannon testified that he could not recall if the vehicle contained other people. While it is possible a jury would string all of this together and conclude Dahlquist and Weston were together throughout the morning of the day of Weston's murder, it is a matter of inference rather than of certainty, and we cannot say beyond a reasonable doubt that a properly instructed jury would draw all of the necessary inferences in a manner favorable to the State.

conclude, beyond a reasonable doubt, that Dahlquist would have been convicted even if the trial court had not admitted his statement, such error was not harmless. Therefore, we must reverse Dahlquist's conviction and remand for a new trial.[9]

9. Dahlquist also argues that the trial court misapplied Utah Code Ann. § 76–3–203 (Supp.1995) when it enhanced Dahlquist's prison sentence by an indeterminate term of one to five years, based upon the use of a firearm. However, the "statute requires that the trial court choose between a determinate one-year sentence *or* an indeterminate sentence of one to five years." *State v. Beltran–Felix,* 922 P.2d 30, 38 (Utah App.1996)(emphasis in original). The trial court here made a permissible choice. Accordingly,

BILLINGS, J., concurs.

WILKINS, Associate P.J., dissents.

Dahlquist's sentence enhancement argument is not well taken. Moreover, given our disposition of the case, we need not reach Dahlquist's additional arguments about whether the trial court erred in denying his motion to sever his trial from that of his codefendant. However, should Telford's appeal also be successful, it would appear preferable that the two not be tried together again. Dahlquist's severance and confrontation arguments appear to have merit.