**2019 UT App 49**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
SERGIO BRISENO MEDINA,
Appellee.

Amended Opinion[1]
No. 20170328-CA
Filed March 28, 2019

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 161903223

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellant

Sarah J. Carlquist, Scott A. Wilson, and Jesse M. Nix,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M.
CHRISTIANSEN FORSTER concurred.

MORTENSEN, Judge:

¶1     Because this case comes to us on interlocutory appeal, the following facts and allegations remain undetermined. "On interlocutory review, we recount the facts as alleged and in a light most favorable to the ruling below." *State v. Stewart*, 2018

---

1. This Amended Opinion replaces the Opinion in Case No. 20170328-CA issued January 17, 2019. After our original opinion issued, Defendant filed a petition for rehearing. We grant the petition. Paragraph 1 is new; paragraphs 3 through 8 and paragraph 12 of the original opinion have been deleted.

UT 24, ¶ 2 n.1 (cleaned up). A woman (Victim) was found fatally stabbed on the side of a road. The ensuing investigation led police to Sergio Briseno Medina. During an interview, detectives (Detectives) read Medina his *Miranda* rights.[2] Medina invoked his right to counsel, but immediately after invoking, Medina initiated a substantive conversation with the Detectives regarding the investigation, the circumstances surrounding the murder, and the pending charges against him. After the Detectives told Medina that they had "questions for [him] about [the murder]," Medina stated, "I'm gonna answer questions," and he demanded to know "what's going on" and "[w]hy is it me . . . being targeted for something that I wasn't even nearby." During the resulting conversation, Medina made several incriminating statements. Three days later, the Detectives, after confirming that Medina understood he could have an attorney present, interviewed him a second time. The State charged Medina with murder and obstructing justice. Medina moved to suppress his statements made during the interviews, arguing that his *Miranda* rights were violated by the Detectives' questioning without counsel present. The district court granted Medina's motion, and the State appeals.

¶2    We reverse.

## BACKGROUND

### The Interviews

¶3    Medina was in Denver, Colorado when law enforcement located him. A search of Medina's and Victim's cell phone records had established that Medina was in the vicinity of Victim's body and her jeep around the time of the murder; a

---

2. *Miranda* rights include the right to remain silent and the right to have an attorney present during custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 440 (1966); *see also infra* ¶ 11.

search of the jeep uncovered Medina's fingerprints on the outside of the jeep and Victim's blood on the interior. Medina was arrested and brought into a Denver police station for questioning.

¶4 Prior to any questioning, the Detectives read Medina his *Miranda* rights, whereupon Medina invoked his right to counsel. The conversation ensued as follows:

> The Detectives: Okay well just so you're aware we just wanna make sure that you are aware of your rights okay you still have those (inaudible) and you wanna find out and you wanna have a discussion with us and we wanna make sure you know your rights okay?
>
> Medina: Ya.
>
> D: So you do know you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to have an attorney present with you while you're being questioned. If you can't afford to hire one, one will be appointed to represent you before any questioning if you wish. Okay?
>
> M: Can I have an attorney present then?
>
> D: So . . . and if you . . . so you're saying you don't wanna talk to us without your attorney present?
>
> M: Well ya the thing is I don't know what's going on. I wanna know what's going on.
>
> D: Okay.
>
> M: Why is it that my sister[']s door gets kicked in . . . I've got an officer asking if I got my hands . . .

if I have an injury on my hands and they're checking my hands and I was like no what's goin on . . . Does he have . . . What injury are you talking about . . . What's going on. You know what I mean? I'm only here tryin (inaudible) cause I wanna lay off the meth cause I was consumin (inaudible) all this goin on and I was like what's goin on. My sister's mad at me right and doesn't want to talk to me because the same situation.

D: Is it what happened with her . . .

M: Ya I mean come on wouldn't you be mad?

D: Sure. I'd be frustrated absolutely and that's . . . We can have a discussion about that absolutely.

M: And that's why I'm like okay what's goin on. I got people callin me hey there's a homicide or something . . . What are you guys talkin about, you know what I mean?

D: Sure.

M: And that's what I wanna know what's going on it's like . . . I'm trippin out because that stuff you don't play around with.

D: Right.

M: You don't joke around with. That's not a joke so all I wanna ask you is what's going on here please. I'm gonna answer questions, but at the same time I don't want to get bullshit all mixed up you know what I mean?

D: And we're here to talk about that. We're here to . . . we wanna discuss that with you.

M: Okay.

D: But you know we do have questions for you about it. You know we're trying to see . . . Your name was brought up that's how we're here you know? People brought your name up and so here we are and we wanna be able to talk to you about it, but it's up to you I mean . . .

M: Okay (inaudible) what's going on man please? What's goin on I actually want to know . . . That's what . . . That's what I'm asking what's goin on. Why is it me that I'm being targeted for something that I wasn't even nearby. It's like what the fuck.

D: Okay.

¶5    Medina went on to explain that he was confused by the circumstances of his arrest. Medina then agreed to answer the Detectives' questions and admitted that Victim was a "friend," that they sold drugs together, and that they had gotten into an argument on the day of the murder. He continued to deny involvement in Victim's murder. The Detectives also questioned Medina about his text messages to his fiancée and to another individual.

¶6    Three days later, the Detectives interviewed Medina for a second time. The second conversation went as follows:

The Detectives: So you asked me to do a couple things when we last talked. I did that okay so I got some . . . some good news as far as that goes okay, but just as we get talkin I just want to make sure you still are aware of your rights okay? Do you understand your rights too?

Medina: Yes.

D: That you do have the right to an attorney and you don't have to talk. You can have on[e] present with you and all that right? So you still understand those?

M: Yes.

D: You're still okay to talk to me then?

M: Ya.

¶7    Thus, the Detectives confirmed Medina's understanding that he could have an attorney present or continue to speak with the Detectives without an attorney present. Medina then claimed that he spoke with Victim on the phone while he was at or near a specific Maverick gas station and that during the call, "[Victim] was talking and laughing with somebody in the background." But surveillance footage obtained by police from the Maverik store refuted Medina's story—he was nowhere to be seen at or near the store during the time Medina claimed to be there. The State subsequently charged Medina with murder and obstructing justice.

*The Motion to Suppress*

¶8    After the State filed charges against him, Medina moved to suppress the statements made to the Detectives during his interrogation, arguing that they persisted in questioning him after he had invoked his *Miranda* right to an attorney. The district court granted the motion, finding that Medina had invoked his right to counsel, and that even though he had "initiated . . . further conversation, as he continued to talk after his request for counsel," he did not knowingly and intelligently waive his right to counsel. The court further ruled that because Medina did not waive his *Miranda* rights in the first interrogation, his statements in the second interview were also inadmissible. But the court qualified the ruling, stating that had *Miranda* procedure been properly followed in the first interview,

"the second recitation of *Miranda* preceding the [second] interview would have been adequate." The State then successfully petitioned for leave to take an interlocutory appeal from the district court's order granting Medina's motion to suppress his statements to police.

## ISSUE AND STANDARD OF REVIEW

¶9     We address only one issue in this case: whether the district court correctly granted Medina's motion to suppress. Rulings regarding the validity of a *Miranda* waiver are reviewed for correctness, while granting "some degree of discretion to the trial court because of the wide variety of factual settings possible." *State v. Bybee*, 2000 UT 43, ¶ 16, 1 P.3d 1087 (cleaned up). "When a district court bases its ultimate conclusions concerning the waiver of a defendant's *Miranda* rights, upon essentially undisputed facts, in particular the transcript of an officer's colloquy with the defendant, its conclusions present questions of law which we review under a correction of error standard." *State v. Gardner*, 2018 UT App 126, ¶ 11, 428 P.3d 58 (cleaned up).

## ANALYSIS

### I. The First Interview

¶10     The State argues on appeal that Medina "validly waived his *Miranda* rights by his conduct and words after initiating further discussion with police." We agree.

¶11     The Fifth Amendment of the United States Constitution states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that law enforcement officers must "protect this privilege by informing an accused person of his or her constitutional

rights before engaging in custodial interrogation." *State v. Dahlquist*, 931 P.2d 862, 866 (Utah Ct. App. 1997) (citing *Miranda*, 384 U.S. at 444). Those rights include the right to remain silent and the right to have an attorney present. *Miranda*, 384 U.S. at 444.

¶12    After an accused's *Miranda* rights are read, they "must unambiguously request counsel" in such a way that the "desire to have counsel present" is sufficiently clear. *Davis v. United States*, 512 U.S. 452, 459 (1994). "Interrogation must cease if the accused invokes his or her right to consult with an attorney, and, with limited exceptions, the prosecution may not use any statements made by the accused taken in violation of *Miranda*'s protections." *Dahlquist*, 931 P.2d at 866. Both Medina and the State agree, and the district court ruled, that Medina unambiguously invoked his right to counsel initially.

¶13    But if, after invoking the right to counsel, the accused himself "'initiates further communication, exchanges, or conversations with the police,' then he has effectively waived his right to counsel and the interrogation may continue." *State v. Gardner*, 2018 UT App 126, ¶ 15, 428 P.3d 58 (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)). An accused's statements made "after he has invoked his right to counsel and before counsel is made available to him are admissible if three conditions are satisfied." *State v. Moore*, 697 P.2d 233, 236 (Utah 1985); *see also Edwards*, 451 U.S. at 481–82; *State v. Newton*, 682 P.2d 295, 296 (Utah 1984).

¶14    "First, it must be the accused, not the law enforcement officers, who initiates the conversations in which the incriminating statements are made. Second, the prosecution must show . . . a knowing and intelligent waiver of the right to counsel. Third, the accused's statements must be shown by a preponderance of the evidence to have been voluntarily made." *Moore*, 697 P.2d at 236. We address each condition in turn.

A.    Initiated Conversation

¶15    The State argues that "immediately after invoking his right to counsel, [Medina] initiated further conversation with [the Detectives] about the investigation." Medina counters with the argument that "it is not enough for the defendant to initiate a routine conversation about 'something unrelated to the crime charged,' to relinquish his previously invoked right to counsel." To bolster his argument, Medina cites *State v. Dahlquist*, 931 P.2d 862 (Utah Ct. App. 1997), arguing that "Medina did not initiate a conversation with police that related either directly or indirectly to the investigation." While we agree that initiating a routine conversation about something unrelated to the crime charged is not enough to relinquish an accused's right to counsel, *State v. Moore*, 697 P.2d 233, 236 (Utah 1985), we are persuaded by the State's argument that Medina's conversation was more than just routine or unrelated to the crimes charged.

¶16    In *Dahlquist*, this court reversed a district court's denial of a motion to suppress where the police continued to question a defendant after the defendant had invoked counsel, but had subsequently asked, "What am I being questioned about?" 931 P.2d at 864. The court explained, "In order for a defendant to initiate a conversation with authorities that will be held to constitute a willingness to talk about the charges without counsel, he or she must indicate a desire to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 866 (cleaned up). And the court went on to state that,

> [D]efendant initiated no such open-ended conversation. After invoking his right to counsel, he merely asked what he was being questioned about. That question was succinctly answered and his invocation of the right to counsel was simultaneously acknowledged. There the matter should have been left until Dahlquist had counsel

present or definitively waived his right to counsel, either expressly or by initiating a discussion relative to the substance of the investigation. . . . Instead of heeding his own recognition that he could not ask Dahlquist any questions, [the detective] continued the conversation by "advising" Dahlquist, without request, of specific "facts" related to the investigation.

*Id.*

¶17    On those facts, the court held that the detective's "tactic" was "reasonably likely to elicit an incriminating response from Dahlquist" and that "[b]y continuing the custodial dialogue after acknowledging that Dahlquist had invoked his right to consult an attorney, albeit in the form of a statement rather than a question, [the detective] violated Dahlquist's *Miranda* rights." *Id.* at 867.

¶18    Here, Medina's statements to the Detectives go beyond the scope of those made in *Dahlquist*. They are more akin to the statements made in *State v. Gardner*, 2018 UT App 126, 428 P.3d 58. In that case, two officers informed a defendant of his *Miranda* rights and the defendant invoked those rights. *Id.* ¶ 16. But before the officers could leave the interrogation room, the defendant went on to "explain that [the victim] and her mother had been threatening him for years about reporting inappropriate conduct between himself and [the victim]," and "told a long story about some problems with [the victim's] mother." *Id.* One of the officers eventually interrupted the defendant and "asked again if he should try to reach [the defendant's] attorney, to which [the defendant] again responded in the affirmative." *Id.* But after the first officer left the room to call the defendant's attorney, the defendant continued to speak to a second officer—unsolicited—about domestic issues with [the victim's] mother. *Id.*

¶19    There, this court held that "[o]nce [the defendant] told the officers that [the victim] and her mother had been threatening to report him for engaging in inappropriate conduct with [the victim], without being asked a question by the officers," he had effectively waived his right to counsel because he "initiated further communication, exchanges, or conversations with the officers specifically related to the crime for which he was being interrogated." *See id.* ¶ 17 (cleaned up).

¶20    Here, Medina invoked his right to counsel, but then, without prodding from the Detectives, immediately went on to state,

> Well ya the thing is I don't know what's going on. I wanna know what's going on. . . . Why is it that my sister[']s door gets kicked in . . . I've got an officer asking if I got my hands . . . if I have an injury on my hands and they're checking my hands and I was like no what's goin on . . . Does he have . . . What injury are you talking about . . . What's going on. You know what I mean? I'm only here tryin (inaudible) cause I wanna lay off the meth cause I was consumin (inaudible) all this goin on and I was like what's goin on. My sister's mad at me right and doesn't want to talk to me because the same situation.

These types of statements are not simply "routine," nor "unrelated to the crime charged," as Medina suggests. Rather, upon invoking his right to counsel, Medina immediately asked what was going on, and the context of his continuing questions makes clear that he was not asking what process he would be subject to, but was instead asking about the investigation of the case and his actions as he spontaneously launched into an extensive and elaborate explanation for the circumstances and his whereabouts on the night of the murder.

¶21    Thus, Medina's statements are far different from those in *Dahlquist*, in which the defendant simply asked, "What am I being questioned about?" *Dahlquist*, 931 P.2d at 866. They are much more similar to the statements made in *Gardner*, in which the defendant not only asked what was going on, but went on to—without invitation or provocation—explain himself and divulge further details regarding the crime charged. *See Gardner*, 2018 UT App 126, ¶ 16. Medina gave the Detectives no chance to leave the room, let alone contact his attorney, before initiating further conversation and insisting that he receive answers from the Detectives. Unsolicited, Medina asked what was going on; why the police had kicked in his sister's door; questioned why the police wanted to check his hands; and offered an explanation for his trip to Denver. Accordingly, we conclude that Medina initiated further communication with the Detectives and that the district court incorrectly ruled that the statements did not involve the underlying crime.

B.    Knowing and Intelligent Waiver

¶22    Because we have determined that Medina initiated further contact with the Detectives, and thereby waived his right to have counsel present during the interrogation, we must next turn to the question of whether he waived this right knowingly and intelligently. *See State v. Moore*, 697 P.2d 233, 236 (Utah 1985) (holding that after showing that the accused initiated contact with law enforcement, "the prosecution must show, on the motion to suppress, a knowing and intelligent waiver of the right to counsel"); *see also Martinez v. Cate*, 903 F.3d 982, 992–93 (9th Cir. 2018) (holding that "[i]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked" (cleaned up)); *Bush v. Warden*, 573 F.App'x 503, 510–11 (6th Cir. 2014) (stating that "even if the accused reinitiates conversation with police after invoking his or her right to counsel, the burden remains on the prosecution to demonstrate

that the reinitiation events constituted a knowing and intelligent waiver under a totality of circumstances").

¶23 "The determination of whether a waiver of the right to counsel was made knowingly and intelligently depends upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Moore*, 697 P.2d at 236 (cleaned up); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (stating that whether a waiver is knowing and intelligent is based upon "the totality of the circumstances"); *Bone v. Polk*, 441 F.App'x 193, 196 (4th Cir. 2011) (explaining that when "evaluating the totality of the circumstances for the purposes of determining the validity of a *Miranda* waiver, we consider factors such as a defendant's intelligence and education, his age and familiarity with the criminal justice system, the proximity of the waiver to the giving of the *Miranda* warnings, and whether he reopened the dialogue with the authorities" (cleaned up)); *State v. Barrett*, 2006 UT App 417, ¶ 11, 147 P.3d 491 (explaining that "determin[ing] whether [a d]efendant knowingly and intelligently waived his *Miranda* rights" is done by "examining the particular facts and circumstances surrounding the case").

¶24 A knowing and intelligent waiver of the right to counsel exists when a defendant expresses a desire to "tell . . . what really happened," and then proceeds to make incriminating statements about what happened without further prodding by the investigating officers,[3] *see State v. Hilfiker*, 868 P.2d 826, 831 (Utah Ct. App. 1994) (cleaned up); *see also Smith v. Duckworth*, 824 F.3d 1233, 1247 (10th Cir. 2016) (explaining that to be considered knowing and intelligent, "the waiver must have been

---

3. The waiver need not be express. It may be inferred from a defendant indicating that he understands his rights and the defendant's subsequent course of conduct. *See State v. Barrett*, 2006 UT App 417, ¶ 11, 147 P.3d 491.

made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it").

¶25 The State argues that the district court incorrectly concluded that Medina's waiver was not knowingly made. We agree. The district court based its decision, in part, on the fact that the Detectives "had asked questions intended to elicit additional information" and, in part, on the fact that the Detectives did not "seek a clarification of [his] invocation of [the] right to counsel" after Medina initiated further discussion about the investigation.

¶26 To the district court's first point, we conclude that the court incorrectly determined that the Detectives improperly asked questions intended to elicit additional information from Medina. The exchange between Medina and the Detectives proceeded as follows:

> Medina: Can I have an attorney present then?
>
> The Detectives: So . . . and if you . . . so you're saying you don't wanna talk to us without your attorney present?
>
> M: Well ya the thing is I don't know what's going on. I wanna know what's going on.
>
> D: Okay.
>
> M: Why is it that my sister[']s door gets kicked in . . . I've got an officer asking if I got my hands . . . if I have an injury on my hands and they're checking my hands and I was like no what's goin on . . . Does he have . . . What injury are you talking about . . . What's going on. You know what I mean? I'm only here tryin (inaudible) cause I wanna lay off the meth cause I was consumin (inaudible) all this goin on and I was like what's goin on. My sister's

mad at me right and doesn't want to talk to me because the same situation.

¶27 Here, Medina implored the Detectives to discuss the murder investigation with him, continually asking them questions pertaining to the investigation and giving explanations for the circumstances. The district court even conceded that "the Detectives did not do much prodding." While the Detectives did go on to ask questions such as, "Is that what happened with her," and make statements such as, "We can have a discussion," those statements were made after Medina's completely unsolicited statements regarding his sister, his hands, the police, his drug usage, and his demand to know more about the investigation against him. Medina's desire to "tell . . . what really happened," followed by making incriminating statements about what happened without further prodding by the investigating officers, constitutes a knowing and intelligent waiver. *See Hilfiker*, 868 P.2d at 831 (cleaned up). There is no indication from the record that Medina's waiver was made without "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *See Duckworth*, 824 F.3d at 1247.

¶28 To the district court's second point—that the Detectives did not "seek a clarification of [his] invocation of [the] right to counsel" after Medina initiated further discussion about the investigation—we conclude that such a clarification was not required. The Utah Supreme Court has held that if "a defendant makes an ambiguous or equivocal request for an attorney, questioning with respect to the subject matter of the investigation must immediately stop, and any further questioning must be limited to clarifying the request." *State v. Wood*, 868 P.2d 70, 85 (Utah 1993), *overruled on other grounds by State v. Mirquet*, 914 P.2d 1144, 1147 n.2 (Utah 1996). Here, all parties agree Medina's request for an attorney was not "ambiguous or equivocal." Therefore, a clarification was not required. The request was unambiguous but Medina,

immediately and unprompted, proceeded to carry on a discussion with the Detectives. "Police are not required to rewarn suspects from time to time." *Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010); *see also Edwards v. Arizona*, 451 U.S. 477, 485 (1981) ("[N]othing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to [a defendant's] voluntary, volunteered statements and using them against [the defendant] at the trial."). Accordingly, the district court incorrectly ruled that Medina's statement was not made knowingly and intelligently.

C.     Voluntary Statement

¶29     Finally, the State argues that Medina's statements were made voluntarily. We agree. The test of whether a statement is made voluntarily "is never mechanical, but must duly consider both the characteristics of the accused and the details of the interrogation. The ultimate inquiry is whether physical or psychological force or other improper threats or promises prompted the accused to talk when he otherwise would not have done so." *State v. Hilfiker*, 868 P.2d 826, 831 (Utah Ct. App. 1994) (cleaned up); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) (noting that a voluntary statement is "the product of a free and deliberate choice rather than intimidation, coercion, or deception"). While an accused "will likely experience at least some anxiety as a natural incident of being arrested and incarcerated that may affect the accused's psychological condition," a statement is not involuntary because "an accused experiences some anxiety because of his arrest and incarceration." *State v. Moore*, 697 P.2d 233, 236 (Utah 1985).

¶30     Here, the district court ruled that even though there was "no evidence of coercion," the State had failed to present sufficient evidence that the statements were made voluntarily. The district court erred by requiring the State to present additional evidence, as evidence beyond the circumstances of the interview is not required. *See id.* at 237 (holding that "there must be some physical or psychological force or manipulation

that is designed to induce the accused to talk when he would not otherwise have done so," and because "[n]one ha[d] been shown," the statement was considered voluntary); *see also Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ("Absent police conduct *causally related* to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." (emphasis added)); *State v. Mabe*, 864 P.2d 890, 893 (Utah 1993) ("To be involuntary, there must be a causal relationship between the coercion and the subsequent confession.").

¶31 The interrogation transcript, along with videos of the interrogation, constitute a sufficient basis on which to conclude that the statements were made voluntarily. We can presume that "an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010). Accordingly, because all three conditions to the admission of Medina's statements were satisfied, the district court should have denied Medina's motion to suppress, and his statements in the first interview should have been admitted.

## II. The Second Interview

¶32 The State argues that "[b]ecause Medina initiated a conversation with the [D]etectives after invoking his right to counsel and validly waived his *Miranda* rights" during the first interview, the statements Medina made during the second interview should also be admitted. We agree. Prior to the second interview, the Detectives and Medina engaged in the following conversation:

> The Detectives: So you asked me to do a couple things when we last talked. I did that okay so I got some . . . some good news as far as that goes okay, but just as we get talkin I just want to make sure

you still are aware of your rights okay? Do you understand your rights too?

Medina: Yes.

D: That you do have the right to an attorney and you don't have to talk. You can have on[e] present with you and all that right? So you still understand those?

M: Yes.

D: You're still okay to talk to me then?

M: Ya.

¶33 The district court concluded that the Detectives' second recitation of Medina's *Miranda* rights prior to the second interview would have been adequate if Medina had voluntarily waived his right to counsel in the first interview. And as discussed, *supra* Part I, the *Miranda* warning given in the first interview was sufficient. Consequently, it carried over to the second interview that was given only three days later. *See Maryland v. Shatzer*, 559 U.S. 98, 110 (2010) (holding that officers need not re-recite *Miranda* warnings unless fourteen days have passed since the break in custody). And here the Detectives reminded Medina of his right to counsel and confirmed that he understood his rights and still wanted to talk to the Detectives. Therefore, the Detectives did not violate Medina's right to counsel in the second interview and the district court incorrectly granted Medina's motion to suppress the statements made in the second interview.

## CONCLUSION

¶34 Medina initiated further communication with the Detectives regarding topics that were not "routine" nor

"unrelated to the crimes charged," effectively waiving his right to counsel. Further, his waiver was made knowingly and intelligently, as well as voluntarily. We therefore conclude that the Detectives did not violate Medina's right to counsel in the second interview, and we reverse the district court's grant of Medina's motion to suppress the statements made in both the first and second interviews.

———