**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOHN HARDY ROSE,
          *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
          *Respondent-Appellee.*

No. 00-12

JOHN HARDY ROSE,
          *Petitioner-Appellee,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
          *Respondent-Appellant.*

No. 00-11

Appeals from the United States District Court
for the Western District of North Carolina, at Asheville.
Richard L. Voorhees, District Judge.
(CA-00-20-1-V)

Argued: April 5, 2001

Decided: May 24, 2001

Before WILLIAMS, MICHAEL, and TRAXLER, Circuit Judges.

---

Affirmed in part and reversed in part by published opinion. Judge
Williams wrote the opinion, in which Judge Michael and Judge Trax-
ler joined.

---

## COUNSEL

**ARGUED:** Michael L. Minsker, HIGGINS MINSKER, P.L.L.C., Charlotte, North Carolina, for Appellant. Valerie Blanche Spalding, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

## OPINION

WILLIAMS, Circuit Judge:

A North Carolina jury convicted John Hardy Rose of capital murder for the murder of Patricia Stewart. Following a capital sentencing proceeding, the jury recommended, and the trial court imposed, a sentence of death. After exhausting all available state remedies, Rose petitioned the United States District Court for the Western District of North Carolina for a writ of habeas corpus. *See* 28 U.S.C.A. § 2254 (West Supp. 2000). The district court ordered that the writ be granted on the ground that the State habeas court applied the wrong legal standard to Rose's ineffective assistance of counsel claim. The remaining allegations in Rose's habeas petition were dismissed.

Rose seeks a certificate of appealability granting permission to appeal the portion of the district court's order denying Rose's habeas relief. The State cross-appeals the portion of the district court's judgment in which the district court granted the writ and remanded to the State habeas court for its application of the proper legal standard to Rose's ineffective assistance of counsel claim.[1] For the reasons that follow, we reverse the portion of the district court's judgment granting the writ, affirm the district court's entry of summary judgment in favor of the State as to Rose's claims, and decline to grant Rose a certificate of appealability.

---

[1]No certificate of appealability is necessary with respect to the portion of the district court's judgment from which the State appeals. Fed. R. App. P. 22(b)(3).

## I.

### A.

After receiving a report that Patricia Stewart was missing and finding small drops of blood in and around her apartment, the Graham County, North Carolina, police department conducted several interviews with Rose, who lived with his sister and her boyfriend in the apartment above Stewart.[2] On January 13, 1991, State Bureau of Investigation (SBI) Agent Mark Nelson performed a consent search of a blue Pontiac owned by Rose and a yellow Ford owned by his sister. In the two cars, investigators found a pair of numchucks, a tire tool, jumper cables, a black sleeveless jacket, and a thermos, all of which tested positive for blood. The thermos and the trunk of the Ford contained bloodstains that were consistent with Stewart's blood type and inconsistent with Rose's.

On January 14, SBI Agent Frye met with Rose to discuss the results of the searches of the two automobiles. Rose told Frye that he did not want to discuss Stewart's disappearance "because the situation surrounding it was too bad to talk about, and he was concerned about what his family would think of him." *State v. Rose*, 439 S.E.2d 518, 525 (N.C. 1994). Rose told the officers, however, that "the disposition of Patricia Stewart was so bad" that they would not be able to find any of her remains. *Id.*

On January 15, agents spoke again with Rose, this time in the presence of his mother. Rose's mother told Rose that he needed to reveal any information he had regarding Stewart's disappearance. Rose informed the agents that Stewart's body was located at his grandmother's farm. Agents radioed this information to officers searching for the victim's body, who in turn informed the agents that the body had already been uncovered.

Rose then was arrested and given *Miranda* warnings for the first time. *Miranda v. Arizona*, 384 U.S. 436 (1966). Rose waived his

---

[2]These facts are derived from the statement of facts in the Supreme Court of North Carolina's published opinion affirming Rose's conviction on direct appeal. *See State v. Rose*, 439 S.E.2d 518 (N.C. 1994).

*Miranda* rights and gave an additional statement in which he said he had been involved in a relationship with Stewart, which Stewart had been keeping secret. According to Rose's statement, he was in Stewart's apartment after midnight on Wednesday, January 2. While he was there, a friend came to visit Stewart, and Stewart asked Rose to leave and come back later, which he did. Rose smoked marijuana and drank a quart of whiskey before going to Stewart's apartment. There, Rose claims that he told Stewart that he was going back to his girlfriend in Alabama; Stewart retorted that she would have him arrested for rape if he tried to leave her. In response to this threat, Rose said that he "just went crazy," stabbing, beating, and choking Stewart to death. *Rose*, 439 S.E.2d at 525.

Rose then wrapped Stewart's body in her bed linen and put it in the trunk of his Pontiac, but the car would not start. Rose stated that he then went back inside and tried to clean up, leaving Stewart in the trunk. He took the knife that he used to kill Stewart to his apartment, cleaned it, and placed it in a box in his bedroom. The next evening, Rose borrowed his sister's Ford automobile and transferred the body to the trunk of the Ford. He drove the Ford to his grandmother's farm, took the body behind the house, used his grandmother's hoe to dig a shallow grave, poured gasoline on the body, set it afire, and walked away. When the fire went out, Rose returned and covered the body with rocks, leaves, and tree branches.

Rose's testimony during the guilt phase of the trial was similar to his confession, with a few deviations. Rose testified that after he told Stewart he was going to Alabama, Stewart reached over and picked up a pocket knife that she had lying on her nightstand beside her bed. Rose claimed that Stewart shook the knife and said, "You ain't going nowhere." *Id.* at 526. Rose testified that he jumped up and hit Stewart's arm, causing the knife to hit her in the head, and immediately jumped on top of her. Rose testified that he then "heard something pop, backed up and saw blood coming out of Stewart's head." *Id.* Rose testified that "he did not remember choking Stewart that morning and that he did not intend to harm her and did not think anything like that would happen." *Id.*

A medical examiner testified that Rose stabbed Stewart five times, with four knife wounds to her body and one knife wound to her head that was inflicted with enough force to pierce her skull. *Id.* at 532.

## B.

The jury returned a verdict finding Rose guilty of first-degree murder. Following the return of the guilty verdict, a capital sentencing proceeding was held pursuant to N.C. Gen. Stat. § 15A-2000 (1999). At sentencing, the State introduced as aggravating evidence exhibits related to Rose's conviction in Mississippi for attempted rape. *See Rose*, 439 S.E.2d at 526. As mitigating evidence, Rose testified about his troubled childhood and upbringing. *See id.* He testified that his father was an alcoholic and was abusive to Rose's mother and siblings. *See id.* At the age of twelve, Rose and his sister were taken to live with a relative and told that they were going to be given away. *See id.* Rose also described his military service in the United States Marine Corps and the Army, from which he received honorable discharges. *See id.* Rose's mother and sisters also testified, verifying Rose's troubled upbringing. *See id.* at 527. Sheriff's Department employees testified that Rose had been a good prisoner, and Rose's employer testified that he was a good employee. *See id.* Based upon a weighing of these various mitigating and aggravating factors, the jury recommended, and the trial court imposed, a sentence of death. *See* N.C. Gen. Stat. § 15A-2000(b) (2000).

On May 12, 1992, Rose appealed to the North Carolina Supreme Court, which unanimously found no error in Rose's conviction or death sentence. On June 27, 1994, the United States Supreme Court denied Rose's petition for a writ of certiorari. Rose filed a petition for state habeas corpus relief, which is termed a Motion for Appropriate Relief ("MAR") in North Carolina. After holding an evidentiary hearing, the state habeas court denied Rose's requested relief.

Rose then petitioned the federal district court for habeas relief, challenging his conviction and sentence on numerous grounds. The petition was referred to a United States Magistrate Judge, who recommended that the district court dismiss on summary judgment the majority of Rose's claims but grant the writ with respect to Rose's ineffective assistance of counsel claim.

After a de novo review, the district court agreed with the magistrate judge's recommendation and issued a writ of habeas corpus with respect to Rose's ineffective assistance of counsel claim but dis-

missed Rose's habeas petition with respect to Rose's remaining claims. The district court remanded the ineffective assistance of counsel claim to the state habeas court to determine whether Rose can establish his claim under the governing legal standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

Rose seeks to appeal three issues upon which the district court entered summary judgment in favor of the State: (1) whether his confession was illegally obtained; (2) whether the imposition of the death penalty in North Carolina unconstitutionally discriminates against the impoverished; and (3) whether the ex post facto clause bars the application of N.C. Gen. Stat. § 15A-1419 to his habeas petition. We will address each of Rose's arguments and then turn to the State's argument that the district court erred by remanding the ineffective assistance claim to the state habeas court for application of the proper legal standard.[3]

## II.

To be entitled to a certificate of appealability, Rose must make "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2) (West Supp. 2000). In *Slack v. McDaniel*, 529 U.S. 473 (2000), the United States Supreme Court clarified § 2253's requirements. To make the required showing, a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Id.* at 483-84 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

## A. *ROSE'S EX POST FACTO CLAIM*

Rose filed his MAR on October 4, 1995. On June 21, 1996, the North Carolina legislature amended N.C. Gen. Stat. § 15A-1419 (1999 & Supp. 2000), which addresses default of claims on state col-

---

[3]Rose also argues that the district court made several factual errors regarding the contents of the record. Without deciding whether the district court erred, we hold that the alleged errors are without substantive effect.

lateral review. Prior to this amendment, the procedural bars established under § 15A-1419 were discretionary. The amendment makes the procedural bars found therein mandatory rather than discretionary, unless the petitioner can establish good cause or that the failure to consider the claim will result in a fundamental miscarriage of justice. N.C. Gen. Stat. § 15A-1419(b).[4]

The State habeas court applied the amended version of § 15A-1419 to several of Rose's claims and held the claims procedurally barred. Rose argues that the application of § 15A-1419 as amended violates the Ex Post Facto Clause of the United States Constitution. U.S. Const. art. 1, § 9, cl. 3. The district court rejected this claim on the merits. Because the district court rejected the Ex Post Facto claim on its merits, Rose must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack*, 529 U.S. at 484.

The Supreme Court has recognized four categories of Ex Post Facto criminal laws. *Carmell v. Texas*, 529 U.S. 513, 552 (2000). A law violates the Ex Post Facto Clause when it "punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission; or which deprives one charged with crime of any defense available according to law at the time when the act was committed," *Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (internal quotation marks omitted), or "alter[s] the legal rules of evidence, and receive[s] less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender," *Carmell*, 529 U.S. at 551 (internal quotation marks omitted).

Retroactive application of a procedural law such as § 15A-1419 can violate the Ex Post Facto Clause, but only when the procedural law falls within one of the above four categories. *See Collins*, 497 U.S. at 46 (holding that "by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause."); *Carmell*, 529 U.S. at 537 (noting that *Collins* "eliminated a doctrinal hitch that had developed in our cases, which pur-

---

[4]The North Carolina legislature amended § 15A-1419 in other respects, but the other amendments are not relevant to Rose's claim.

ported to define the scope of the Clause along an axis distinguishing between laws involving 'substantial protections' and those that are merely 'procedural.'").

The amendment to § 15A-1419 making the procedural bars mandatory rather than discretionary does not alter the definition of the crime of first degree murder, of which Rose was convicted, nor does it change his available defenses to the crime of murder or otherwise increase the punishment for which he is eligible as a result of that conviction. Similarly, the amendment does not alter a legal rule of evidence in a manner that requires less evidence to support a conviction. While it is true that the amendment to the procedural bar provision worked to Rose's disadvantage, the Supreme Court explicitly has held that a law does not violate the Ex Post Facto Clause simply because it "alters the situation of a party to his disadvantage." *Collins*, 497 U.S. at 48-49 (emphasis omitted). Instead, the Supreme Court has emphasized that the Ex Post Facto Clause only prohibits changes in the law that affect the "scope of a criminal prohibition after the [unlawful] act is done." *Id.* at 49. The 1996 amendment to § 15A-1419 does not affect the scope of Rose's criminal offense in any of the ways enumerated by the Court in *Carmell*. Accordingly, reasonable jurists could not disagree with the district court's determination that the retroactive application of the 1996 version of § 15A-1419 does not violate the Ex Post Facto Clause. Therefore, we deny Rose's request for a certificate of appealability as to this issue.

## B. *PROCEDURALLY DEFAULTED CLAIMS*

Rose seeks to appeal the district court's denial of several claims pursuant to the district court's finding that the claims were procedurally defaulted. As established in *Slack*, to secure a certificate of appealability on claims that the district court denied pursuant to procedural grounds, Rose must demonstrate both (1) "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. In conducting our analysis under this two-prong test, we may proceed first "to resolve the issue whose answer is more apparent from the record and arguments." *Id.* at 485.

## 1. *Rose's Confession*

Rose first seeks to appeal the district court's denial of his claim that his confession was unconstitutionally compelled with a promise of life imprisonment and then used to secure his death sentence. The district court found that Rose's illegally obtained confession claim was procedurally defaulted for purposes of federal habeas review because the State habeas court determined that it was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(2) (1996).[5] To determine whether Rose is entitled to a certificate of appealability on his confession claim, we first address "whether jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack*, 529 U.S. at 484.

Before the State habeas court, Rose submitted affidavits from his mother and sister, both dated January 6, 1998, averring that on January 15, 1991, an agent told them and Rose directly that "things would go easier on [Rose] if he told them where the body was."[6] (J.A. at 769.) The State habeas court noted that the allegations contained in the affidavits were presented and considered on direct appeal. As Rose's counsel acknowledged at oral argument, Rose's claim is not one premised upon an alleged violation of *Miranda v. Arizona*, 384

---

[5]North Carolina General Statute § 15A-1419(a)(2) provides that issues raised in a MAR that were previously decided on appeal are barred from further consideration in State habeas review. "In the absence of any proffered reason why relitigation of these claims would have been proper, the superior court is precluded from relitigating issues decided by the Supreme Court of North Carolina." *Smith v. Dixon*, 14 F.3d 956, 968 (4th Cir. 1994) (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939) (holding that the decision of a higher court forecloses relitigation of issues the mandate lays to rest)).

[6]At oral argument, Rose's counsel also argued that Rose was told that he would not get the death penalty if he confessed. In support of this contention, Rose's counsel points to Rose's mother's affidavit, in which she states, "I asked Special Agent Frye whether the police would seek the death penalty in the case and [Frye] told Diana and me that the police would not seek the death penalty." (J.A. at 769.) Nowhere in the affidavit does Rose's mother aver that she relayed this promise to Rose or that the promise was repeated in front of Rose. (J.A. at 769.) Thus, we need not address the coerciveness of this alleged promise.

U.S. 436 (1966), but is instead premised upon a promise having been made in exchange for Rose's confession.

We measure whether a confession was unconstitutionally coerced by the totality of the circumstances. *See Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991). At one time, the Supreme Court had held that a confession could not constitutionally be obtained by "any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (internal quotation marks omitted). As the Court in *Fulminante* stated, however, "this passage from *Bram* . . . under current precedent does not state the standard for determining the voluntariness of a confession." *Fulminante*, 499 U.S. at 285. Thus, the existence of a promise in connection with a confession does not render a confession per se involuntary. *See id.*; *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc) ("The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary."). Here, the investigating agent's promise that "things would go easier on Rose" if he confessed did not involve actual physical violence or "a credible threat of physical violence." *Fulminante*, 499 U.S. at 288 (holding that a confession was unconstitutionally coerced based upon the totality of the circumstances and placing special emphasis on the fact that the interrogating agent promised to protect the suspect from physical violence from other inmates in exchange for his confession); *see also Payne v. Arkansas*, 356 U.S. 560, 564-67 (1958) (holding that a confession was unconstitutionally coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door). Nor is there any indication that the investigating agent's statement "critically impaired" Rose's "capacity for self-determination," *Braxton*, 112 F.3d at 780 (internal quotation marks omitted), or that Rose's will "was overborne in such a way as to render his confession the product of coercion," *Fulminante*, 499 U.S. at 288; *cf. Braxton*, 112 F.3d at 782 (noting that "[a]dmonishing a suspect to tell the truth during an investigatory interview" by advising him of potential consequences of failing to tell the truth "does not constitute coercive police conduct rendering a statement involuntary."). Thus, we decline to hold that the cryptic promise that "things

would go easier" on Rose if he confessed amounts to unconstitutional coercion.

Moreover, the circumstances surrounding the confession are replete with indicia of voluntariness. As the State court noted on direct appeal, the evidence shows that Rose voluntarily agreed to talk with law enforcement officers at every juncture leading up to his confession. *State v. Rose*, 439 S.E.2d 518, 536 (N.C. 1994). Rose was repeatedly told he was not under arrest and was free to leave at any time. *See id.* At no time was Rose handcuffed, nor was his freedom of movement otherwise restrained. *See id.* Additionally, the questioning immediately preceeding Rose's confession, which took place at the apartment where Rose was staying, occured in a non-custodial setting. *See Braxton*, 112 F.3d at 783 (holding that an investigatory interview was clearly non-custodial and that the confession was voluntary when the interview took place in the suspect's mother's home, the suspect freely consented to answer the officers' questions, and the suspect was at liberty to terminate the discussion at any time). Accordingly, the totality of the circumstances does not support a finding that Rose's confession was obtained in violation of the Constitution. Because we cannot conclude that "reasonable jurists" would find the question of whether Rose has established a valid constitutional claim "debatable," *Slack*, 529 U.S. at 484, we deny Rose's request for a certificate of appealability.[7]

## 2. *Discrimination Claim*

Rose next seeks to appeal the district court's denial of Rose's claim that North Carolina unconstitutionally discriminates based upon economics in its imposition of the death penalty. Rose argues that North Carolina imposes the death penalty only upon poor people, in violation of the Fifth and Fourteenth Amendments of the United States

---

[7]Having concluded that Rose has failed to establish the first prong of the *Slack* test, we need not address whether the district court was correct in its procedural default ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (noting that when the district court denies a claim pursuant to procedural grounds, the petitioner must demonstrate both the viability of the constitutional claim and the correctness of the district court's procuedural ruling to be entitled to a certificate of appealability).

Constitution. The district court declined to address the merits of Rose's economic discrimination claim because Rose failed to "fairly present" the issue to the State courts; thus, the district court held the claim procedurally barred. (J.A. at 18-19.)

In his Reply Brief, Rose admits that his economic discrimination claim was not presented to the State courts, although he did present a racial discrimination claim.[8] Because Rose concedes that he did not present his economic discrimination claim to the North Carolina courts, we are precluded from addressing the merits of this claim unless Rose demonstrates cause for his state-court default and prejudice resulting therefrom. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).[9]

On appeal, Rose argues that he has established sufficient cause to overcome the procedural default of his claim, claiming that the facts underlying the economic discrimination claim were not readily available to Rose's counsel during the State proceedings. Initially, we note that the record does not reflect that Rose presented any argument with respect to cause before the district court. (J.A. at 19) (stating that "[n]owhere does Petitioner show cause as to why he did not raise his economic discrimination claim in State court"). Thus, Rose's cause argument is deemed waived for purposes of this appeal. *See Skipper v. French*, 130 F.3d 603, 610 (4th Cir. 1997) (noting the general rule that theories presented for the first time on appeal will not be considered).

---

[8]Before the district court, Rose argued that a claim of economic discrimination is not fundamentally different from a claim of racial discrimination for purposes of determining whether his economic discrimination claim was presented to the State courts. On appeal, Rose concedes that his "new" economic discrimination claim was never presented to the State courts. (Appellant's Reply Br. at 13) ("Although this claim was never raised in the original state proceedings or in the State Habeas Court . . . .").

[9]The one exception to the rule requiring cause and prejudice is where the petitioner is able to demonstrate that the habeas court's failure to review his federal claim will result in a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Rose does not argue the applicability of the fundamental miscarriage of justice exception to his discrimination claim.

Assuming, however, that Rose raised his cause argument below, we find it inadequate to overcome the procedural default. It is true that a petitioner can establish cause by showing "that the factual basis for [the] claim was unavailable to him at the time he filed his state habeas petition." *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1998); *see McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). We made clear in *Murphy v. Netherland*, 116 F.3d 97 (4th Cir. 1997), however, that a petitioner cannot establish cause when the facts underlying the claim were in existence and were available upon a reasonably diligent search. *Id.* at 100.

The statistics underlying the economic discrimination claim were available to Rose's counsel upon a reasonably diligent search.[10] Counsel's failure to consider the argument is insufficient to constitute cause. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) (holding that cause must turn on "whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule").

No appeal is warranted when "a plain procedural bar is present and the district court is correct to invoke it" to dispose of a claim. *Slack*, 529 U.S. at 484. Thus, we deny a certificate of appealability on this issue.

## III.

Having determined that Rose is not entitled to a certificate of appealability on the issues raised in his appeal, we next address the State's argument that the district court erred by granting a writ of habeas corpus with respect to Rose's ineffective assistance of counsel claim. The parties agree that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, governs our review of this issue. Pursuant to that statute, a federal court may not grant a writ of habeas corpus with respect to a claim

---

[10]At oral argument, counsel expressed no difficulty in having obtained the statistics underlying Rose's racial discrimination claim. Similar to statistics regarding capital defendants' race, courts maintain records indicating which capital defendants were represented by court-appointed counsel and are, therefore, indigent.

adjudicated on the merits in a state court proceeding unless the state court's adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.A § 2254(d)(1) (West Supp. 2000); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d)(2).

The district court held that the State habeas court rendered its decision in a manner contrary to clearly established law when it denied Rose's ineffective assistance of counsel claim pursuant to the wrong burden of proof. Although the district court noted that Rose's ineffective assistance of counsel claim is meritless, the district court held that it could not independently reassess Rose's ineffective assistance of counsel claim according to the proper standard; instead, the district court "remanded"[11] the claim to the State habeas court. While we agree that the State habeas court applied the wrong burden of proof to Rose's ineffective assistance claim, we disagree with the district court's conclusion that a federal court lacks authority to conduct an independent review of the claim.

## A.

Initially, we note that "clearly established" Supreme Court precedent governs Rose's ineffective assistance of counsel claim. *Williams v. Taylor*, 529 U.S. 362, 390 (2000) (Terry Williams) (holding that an ineffective assistance of counsel claim is clearly established Supreme Court precedent within the meaning of § 2254(d)(1)). The Sixth Amendment, as incorporated by the Fourteenth Amendment, entitles a criminal defendant to effective assistance of counsel on direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court

---

[11]While federal habeas courts often use the language of "remand," as a technical matter, we do not believe that a federal habeas court can "remand" a case to a state habeas court. *See Billiot v. Puckett*, 135 F.3d 311, 316 n.5 (5th Cir. 1998) (noting that federal habeas courts cannot remand cases to state courts).

held that an ineffective assistance of counsel claim has two compo-
nents:

> First, the defendant must show that counsel's performance
> was deficient. This requires showing that counsel made
> errors so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth Amend-
> ment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing
> that counsel's errors were so serious as to deprive the defen-
> dant of a fair trial, a trial whose result is reliable.

*Id.* at 687. To establish ineffectiveness, a "defendant must show that
counsel's representation fell below an objective standard of reason-
ableness." *Id.* at 688. To establish prejudice he "must show that there
is a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different. A rea-
sonable probability is a probability sufficient to undermine confidence
in the outcome." *Id.* at 694.

### B.

We next address whether the State habeas court's ruling was "con-
trary to" the *Strickland* test. *Williams*, 529 U.S. at 412. As the State
concedes, the State habeas court's adjudication of Rose's ineffective
assistance of counsel claim was "contrary to" the *Strickland* test
because the State court applied the wrong burden of proof with
respect to the prejudice prong. In its Memorandum Order and Final
Opinion, the State habeas court denied Rose's ineffective assistance
of counsel claim because the "defendant . . . failed to carry his burden
of proof to show [that the result of the proceeding would have been
different] by the preponderance of the evidence." (J.A. at 285.) In
*Williams*, Justice O'Connor used as an example this precise error to
define the "contrary to" prong:

> If a state court were to reject a prisoner's claim of ineffec-
> tive assistance of counsel on the grounds that the prisoner
> had not established by a preponderance of the evidence that
> the result of his criminal proceeding would have been differ-
> ent, that decision would be "diametrically different," "oppo-

site in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

*Williams*, 529 U.S. at 405-06. Thus, we agree with the district court that the decision-making process by which the State habeas court adjudicated Rose's ineffective assistance of counsel claim is contrary to clearly established Supreme Court law.

### C.

Upon recognizing that the State habeas court's adjudication of Rose's ineffective assistance claim was contrary to clearly established law, the district court held that it lacked the authority to conduct a de novo review of Rose's ineffective assistance claim using the proper legal standard under *Strickland*. In coming to this conclusion, the district court relied upon the magistrate judge's recommendation that *Williams* bars harmless error review of ineffective assistance claims. Of course, we agree with the district court that, if Rose was denied the effective assistance of counsel, the error would not be subject to harmless error review. *Williams*, 529 U.S. at 375 (reiterating the well-settled rule that "[t]he deprivation of the right to the effective assistance of counsel" is a structural error to which harmless error review does not apply). We do not interpret *Williams*, however, as barring our de novo review of whether Rose was, in fact, denied effective assistance of counsel. To the contrary, when we find that a state court decision is contrary to clearly established federal law, we interpret *Williams* as reaffirming the federal habeas corpus courts' obligation to review state court judgments independently to determine whether issuance of a writ is warranted.

In *Williams*, as in this case, the state court erred in its framing of the applicable legal standard under the controlling Supreme Court precedent of *Strickland*. *See Williams*, 529 U.S. at 391. After concluding that the state court applied the incorrect standard, each of the Court's three separate opinions embarked upon a de novo review of the underlying ineffective assistance of counsel claim. *See id.* at 395-399 (opinion of Stevens, J.); *id.* at 415 (opinion of O'Connor, J.); *id.*

at 418-19 (Rehnquist, J., concurring in part and dissenting in part). Thus, rather than call into doubt our authority to conduct a de novo review of Rose's ineffective assistance of counsel claim, *Williams* conclusively affirms our authority to conduct such a review.

Our authority and obligation to conduct an independent review of the substantive constitutional claim is firmly rooted in the underlying purpose of the writ of habeas corpus, which is to ensure that prisoners are not held in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a). As the *Williams* Court noted, the writ of habeas corpus is not designed to correct all constitutional errors, much less all errors of any kind. *See Williams*, 529 U.S. at 375 ("It is, of course, well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas."); *see also id.* at 386 (stating that a federal court must "attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error *sufficiently serious to warrant the issuance of the writ*.") (opinion of Stevens, J.) (emphasis added). Additionally, in analyzing § 2254, we must be cognizant of § 2254's incorporation of concerns for comity, federalism, and finality. *See Williams v. Taylor*, 529 U.S. 420, 436 (2000) (Michael Williams) ("There is no doubt Congress intended AEDPA to advance these [comity, finality, and federalism] doctrines.").

As Rose concedes, the facts related to his ineffective assistance of counsel claim have been fully developed by the State habeas court pursuant to a four-day evidentiary hearing, during which five witnesses testified and several affidavits were introduced, and the State habeas court resolved all credibility determinations related to Rose's ineffective assistance of counsel claim. Despite Rose's concession, he contends that issuance of a conditional writ is warranted because the State court is better suited to apply the *Strickland* standard to his claim, insofar as the application of the standard is a fact-intensive inquiry that depends on the subtleties between varying burdens of proof. The evidence introduced before the State habeas court, as well as the court's factual findings and conclusions therefrom, are fully set forth in that court's Memorandum Order and Final Opinion and,

therefore, are easily accessible to this Court on review, as is the full record of Rose's prior state proceedings. Inasmuch as the only task remaining is application of a legal standard crafted pursuant to federal law to facts that are readily available to this Court, we consider ourselves well-equipped to evaluate the merits of Rose's ineffective assistance claim.

If, after applying the *Strickland* standard to the facts developed by the State habeas court, we determine that Rose actually received effective assistance of counsel, Rose will have failed to demonstrate that constitutional error infected his trial or conviction in any way. Neither *Williams* nor § 2254(d)(1) requires issuance of a writ before determining the critical question of whether a prisoner is being held in violation of the Constitution or laws of the United States. Thus, the proper interpretation of the role of § 2254(d)(1) in habeas corpus review is that it establishes a threshold by which we determine whether we are authorized to issue a writ, but it does not compel the issuance of a writ once the standard set forth therein has been satisfied. *See id.* at 412 (deeming § 2254(d)(1) a "new constraint" on federal courts' power to issue writs and stating that a federal court "may" issue the writ upon determining that the standards found in § 2254(d)(1) are satisfied); *see also Weeks v. Angelone*, 528 U.S. 225, 237 (2000) (referring to the issue under § 2254(d)(1) as whether habeas relief is "preclude[d]" or "prohibit[ed]," rather than whether such relief is mandated). Rather, § 2254(d)(1) must be read in conjunction with the purpose of the writ, as outlined in § 2254(a), which is to protect a prisoner from being held in violation of federal law. Accordingly, following the Supreme Court's approach in *Williams*, we will conduct a de novo review of Rose's claim to determine whether Rose is being held in custody in violation of his constitutional right to effective assistance of counsel, using the extensive facts that the State habeas court has developed.

## IV.

Turning to the merits of Rose's ineffective assistance of counsel claim, Rose contends that he was denied the effective assistance of counsel at his death penalty proceeding because his attorneys did not adequately investigate the events surrounding his prior violent felony attempted rape conviction that was used by the State as an aggravat-

ing factor. Had his counsel investigated the events surrounding the attempted rape conviction, Rose argues, counsel would have discovered significant mitigating evidence relating to Rose's mental health. Specifically, Rose argues that his counsel should have requested his prison records from his prior attempted rape conviction, which contained information indicating that the prison doctors had diagnosed Rose as suffering from sexual and social disorders. Properly applying *Strickland*, the record supports the State habeas court's ultimate rejection of Rose's ineffective assistance of counsel claim.

During the evidentiary hearing before the State habeas court, Rose introduced testimony pertinent to the mitigating evidence of mental disorders that he currently says should have been introduced to the jury. Dr. Brown and Dr. Berlin, both psychiatrists, testified separately that Rose relayed to them a dramatically different story regarding Stewart's death than Rose had relayed to his trial counsel, law enforcement officers, and the jury.

Dr. Berlin testified that Rose told him that he did not have a relationship with Stewart, but he had instead been spying on her through her window on the night of the murder. On this account, Rose waited until Stewart was asleep before entering her apartment through a window. Rose went to Stewart's bed and stabbed Stewart, wounding but not killing her. Stewart told Rose that if he left without killing her, Rose would escape punishment because she would not be able to identify him. Rose placed Stewart's head in his lap and strangled her with a nylon strap until he heard several "pops" and "snaps." (J.A. at 76.) Rose then put her body in the trunk of his car and violated her by inserting numchucks into her vagina. Rose then masturbated by the car's back bumper. Rose told Dr. Berlin that he had, prior to trial, told one of his trial attorneys the truth about Stewart's death, but the attorney dismissed it.

In addition to relaying this version of Stewart's murder, Rose told Dr. Berlin that he had entered as many as 20 homes and stood fantasizing over the bed of the occupants, while holding a knife and having thoughts of injuring them, and on more than 100 occasions he also had entered other homes and masturbated over people's beds. Based upon Rose's statements and his prior conviction for attempted rape, Dr. Berlin opined that Rose had sexual disorders, voyeurism and sex-

ual sadism, and was mentally impaired respecting his ability to con-
form his conduct to the requirements of law. Rose told Dr. Brown a
similar story about Stewart's murder, adding that before he assaulted
Stewart's vagina with the handles of the numchucks, he burned her
vaginal area with a "pencil torch." (J.A. at 259.)

Other evidence of Rose's disorders included an evaluation from
Dorothea Dix Hospital. Prior to trial, the trial court had ordered that
Rose undergo a psychiatric evaluation at Dorothea Dix Hospital to
gauge Rose's competence to stand trial. The report issued in conjunc-
tion with that evaluation concluded that Rose suffered from a provi-
sional sexual disorder and a mixed personality disorder, but that Rose
was otherwise competent to stand trial. Rose argues that, in light of
this preliminary evidence of mental disorders, his trial counsel should
have further investigated and presented evidence of his disorders to
the jury to support a statutory mitigating factor.

As the State habeas court noted, however, Mr. J.K. Coward, Jr.,
Rose's lead trial counsel, testified that Coward and his co-counsel,
Marcellus Buchanan, were fully aware of the diagnosis of the disor-
ders in the Dorothea Dix report, but they had decided not to pursue
a defense that included Rose's sexual disorders because they felt that
introducing "further bad elements into the case" would mean that they
"would have no chance whatsoever with the jury." (J.A. at 248.) Cow-
ard testified that introducing any testimony regarding Rose's sexual
disorders during the sentencing phase "would eliminate the chance for
any kind of leniency." (J.A. at 248.) Additionally, Coward and
Buchanan felt constrained *not* to introduce evidence of Rose's sexual
disorders because Rose explicitly had instructed them not to present
any evidence that would expose Rose's children to adverse publicity.

Instead of pursuing Rose's mental disorders as a defense or a miti-
gating factor, counsel attempted to avoid any of the sexual content of
Stewart's murder, which they succeeded in doing. Additionally, coun-
sel attempted to engender sympathy for Rose by focusing on his trou-
bled upbringing, good character, and strong work habits.

Our review of relevant excerpts from the transcript of the evidenti-
ary hearing and the findings of the State habeas court conclusively
establishes that Rose's trial counsel acted in an objectively reasonable

fashion by declining to pursue a defense based upon Rose's sexual disorders. Rose's trial counsel made a strategic decision to keep any evidence of Rose's sexual disorders out of the trial because they determined that any such evidence was contrary to the express order of their client to protect his children and would decrease their chances of success. *See Turner v. Williams*, 35 F.3d 872, 904 (4th Cir. 1994) (holding that where there is a conceivable strategic advantage to the decision not to introduce certain evidence, that choice is virtually unassailable on collateral review), *overruled on other grounds* by *O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996). When counsel make a reasonable strategic choice based upon an investigation of the facts, this Court must defer to that strategic choice. *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) ("Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case. The failure to put on such evidence, or the presentation of evidence which then backfires, may equally expose counsel to collateral charges of ineffectiveness. The best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case."). In light of their strategic choice to keep sexual content out of the trial, Rose's counsel was entirely justified to decline to further investigate Rose's prison records related to his Mississipi conviction for attempted rape in an attempt to uncover additional information about Rose's sexual disorders. Thus, Rose has failed to overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland v. Washington*, 446 U.S. 668, 689 (1984).

Nor has Rose established that any alleged constitutional deficiency in the performance of his counsel was prejudicial, that is, that there is a "reasonable probability" that Rose would have been spared the death penalty if his counsel had conducted more extensive investigation into his mental health. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Assuming arguendo that Rose's counsel should have further investigated Rose's sexual disorders, Coward testified that full knowledge of the disorders only would have bolstered his strategic decision to veer away from evidence related to Rose's sexual disorders. Additionally, Coward testified that the additional evidence of Rose's sexual disorders, including Rose's alternate version of Stewart's murder,

would only have further impaired Rose's likelihood of obtaining an acquittal because the evidence would convince the jury "that Rose was a sexual predator as well as a murderer." (J.A. at 79, 250.) Coward further pointed out that Rose's original version of Stewart's murder allowed Coward to obtain jury instructions on second degree murder, voluntary manslaughter, self defense, and accident — none of which would have been available had he presented Rose's second version of the murder.

Nevertheless, Rose argues that but for his counsel's failure to uncover additional evidence about his sexual disorders, there is a reasonable probabilty he would have been spared the death penalty. In support of his argument, Rose points to an affidavit of Samuel Kent Chapman, one of the jurors from Rose's trial, which stated that, if Chapman had found that "Rose suffered from some mental health problem or disorder, [Chapman] would have voted to give him a life sentence rather than a death sentence because [he] do[es] not believe that a person who doesn't appreciate or understand what he is doing needs to be executed."[12] (J.A. at 477-78.)

Chapman's affidavit is too vague to undermine our confidence in the outcome of the death penalty phase of the proceeding. Chapman's affidavit does not indicate that he was aware of Rose's proffered disorders when he averred that a certain type of mental disorders would have influenced his decision to impose the death penalty. Rather, Chapman indicates that when a person has a mental disorder rendering him incapable of appreciating the nature of his conduct, he would be inclined to vote against the imposition of the death penalty. Rose's evidence regarding his mental disorders does not establish that Rose was incapable of appreciating the nature of his conduct. To the contrary, Dr. Berlin opined that Rose was capable of appreciating the criminal nature of his conduct but was incapable of conforming his conduct to the requirements of the law. Similarly, Dr. Brown opined that Rose was fully able to premeditate and deliberate at the time he murdered Stewart; "he knew what he was doing and he knew it was

---

[12]The State did not object pursuant to Federal Rule of Evidence 606(b) to our consideration of the Chapman affidavit. Thus, to the extent Rule 606(b) is applicable, the State has waived the argument that the affidavit fits within the prohibition of Rule 606(b).

wrong." (J.A. at 262.) Thus, Chapman's affidavit simply does not address whether Chapman would have voted against the death penalty if Chapman possessed full knowledge of Rose's particular mental disorders and the alternate version of the events surrounding Stewart's murder. Accordingly, we do not believe that Chapman's affidavit is probative of whether Rose has demonstrated a reasonable probability that he would have received life imprisonment had the jury been presented with evidence of Rose's particular mental disorders.

Mr. Alexander McCoy, who attempted to be certified as a "mitigation specialist," also testified during the evidentiary hearing. The State habeas court declined to accept McCoy as an expert but accepted his testimony and opinions relating to capital trials. McCoy opined that Rose's trial counsel erred by failing to introduce evidence to support a mental health instruction. McCoy admitted, however, that if counsel had introduced Rose's alternative version of Stewart's murder to the jury, it would not have been helpful and would have further supported the statutory aggravating factor. Additionally, he admitted that he knew of no case in which evidence presented to the jury that the defendant suffered from a mental illness that caused him to want to murder, rape, and torture women was found to be persuasive in choosing life over death. (J.A. at 245.) As McCoy admits, his opinion that introduction of such evidence would have been beneficial to Rose amounts to pure speculation.

The only other evidence offered to support a finding of prejudice is that of Mr. David Belser, an attorney who testified as to the proper standard of care. Belser testified that Coward should have ignored his client's wishes and introduced evidence of the sexual disorders. Belser further testified that there was a reasonable probability that introducing such evidence would have changed the jury's verdict. Belser also admitted, however, that he had never tried a capital case in Haywood County, had never put on a defense such as the one proposed by Rose's post-conviction counsel, and knew of no instance where such a defense actually had averted a death sentence. Thus, Belser's opinion is wholly speculative and is unsupported by the evidence in the record.

Far from undermining confidence in either phase of the State trial, after considering all of the evidence introduced related to Rose's inef-

fective assistance of counsel claim, the State habeas court determined
that the evidence adduced at the evidentiary hearing constituted a
"considerably more shocking version of events" that "would virtually
have assured conviction of first degree murder" if offered at trial.
(J.A. at 266-67.) Additionally, the State habeas court noted that intro-
duction of Rose's second version of Stewart's murder, along with
Rose's testimony that he had entered over one hundred other homes
and masturbated over people's beds, would have supported the sub-
mission of the aggravating factor in N.C. Gen. Stat. § 15A-
2000(e)(11), that applies when the murder is part of a course of con-
duct. Moreover, the State habeas court concluded that, if the jury had
been presented with this "repellent" type of sexual disorder evidence,
"including as it does rape, torture and murder," the jury "would have
been even more likely to recommend a death sentence." (J.A. at 275-
76). We agree that introducing evidence of Rose's sexual disorders
would have contributed equally, if not more, to the statutory aggravat-
ing factors than it would have contributed to any statutory or non-
statutory mitigating factors.[13] The alleged mitigation value of intro-

---

[13]In evaluating whether to recommend death, the jury was instructed
that although the jury must unanimously agree that the government
established the existence of an aggravating factor beyond a reasonable
doubt, the jury could consider a mitigating factor in its weighing process
so long as one juror found that Rose established its existence by a pre-
ponderance of the evidence.

The following statutory mitigating factors were submitted at sentenc-
ing and were not found by any members of the jury: (i) Rose has no sig-
nificant history of prior criminal activity; (ii) the murder was committed
while Rose was under the influence of mental or emotional disturbance;
(iii) the capacity of Rose to appreciate the criminality of his conduct or
to conform his conduct to the requirements of the law was impaired; and
(iv) any other circumstances arising from the evidence.

The following non-statutory mitigating factors were submitted and
were found by one or more member of the jury: (i) Rose was reared until
at least his twelfth birthday in the home of his father and mother, the
father being a chronic alcoholic who was abusive both physically and
mentally to Rose's mother in the presence of Rose; (ii) Rose is the prod-
uct of a broken home; (iii) Rose received an honorable discharge from
the United States Army; (iv) Rose received an honorable discharge from
the United States Marine Corps; (v) Rose was a good and obedient pris-

ducing Rose's voyeurism and sexual sadism could not possibly outweigh the detrimental effect that would accompany such evidence because the evidence necessarily introduces components of rape and torture into Stewart's murder. Thus, we cannot say that a reasonable probability exists that the unpresented evidence would have resulted in a different sentencing decision or that Rose's counsel's failure to investigate further into Rose's sexual disorders constitutes ineffective assistance of counsel. *See Satcher v. Pruett*, 126 F.3d 561, 572-73 (4th Cir. 1997) (holding that petitioner did not establish ineffective assistance of counsel based upon counsel's failure to further investigate defendant's mental disorders when counsel introduced other types of mitigating evidence and further investigation into mental health would have produced damaging evidence). Accordingly, we reverse the district court's issuance of a writ of habeas corpus on Rose's ineffective assistance of counsel claim.

## V.

Because Rose has failed to make a substantial showing of a denial of a constitutional right, we deny his request for a certificate of appealability on the claims rejected by the district court. Moreover, because we hold that Rose has failed to establish that he was denied

oner in the Graham County jail for 15 months, and at no time caused any problem with the jailer or other personnel of the Sheriff's Department or with any other inmates confined there; (vi) Rose was a good and obedient prisoner in Haywood County jail for 12 days; (vii) Rose cooperated with agents of the SBI and members of the Graham County Sheriff's Departments when he, at their request, agreed to take and did take a polygraph test at a time when he was not in custody and was free to come and go as he pleased; (viiii) Rose had been a good and reliable employee of Tuckaseegee Mills for a substantial period of time prior to January 1, 1991; and (ix) Rose had a good character and reputation for truth and veracity in the work community of his place of employment.

The following statutory aggravating factors were presented to the jury and were found unanimously to be applicable beyond a reasonable doubt: (i) Rose has been previously convicted of a felony involving the use or threat of violence to another person; and (ii) the facts surrounding Stewart's murder were particularly heinous, atrocious, or cruel.

his Sixth Amendment right to effective assistance of counsel, we reverse the portion of the district court's judgment granting a writ of habeas corpus with respect to Rose's ineffective assistance of counsel claim.

*AFFIRMED IN PART AND REVERSED IN PART*