<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-6969**

ANTHONY MAURICE BONE,

                 Petitioner - Appellant,

      v.

MARVIN L. POLK, Warden,

                 Respondent - Appellee.

Appeal from the United States District Court for the Middle District of North Carolina, at Durham. James A. Beaty, Jr., Chief District Judge. (1:04-cv-01074-JAB-WWD)

Argued: May 13, 2011               Decided: July 29, 2011

Before WILKINSON, KING, and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: James Donald Cowan, Jr., ELLIS & WINTERS, LLP, Cary, North Carolina, for Appellant. Clarence Joe DelForge, III, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Heather Howell Wright, Sophia Liao Harvey, ELLIS & WINTERS, LLP, Greensboro, North Carolina, for Appellant. Roy Cooper, Attorney General, Mary Carla Hollis, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Contending he did not knowingly and intelligently waive his Miranda[1] rights and that his trial counsel was ineffective in failing to raise the issue during his criminal proceeding, Anthony Maurice Bone appeals the denial of his 28 U.S.C. § 2254 habeas petition. Because Bone knowingly and intelligently waived his rights, we affirm.

I

The facts underlying this petition are well known to the parties and set forth in the district court's memorandum order, Bone v. Polk, 2010 WL 2733333, *2-10 (M.D.N.C. July 9, 2010). We therefore present only a brief synopsis here.

After an anonymous tip pointed police to Bone as a suspect in an ongoing murder investigation, Detective Robin Saul of the Greensboro Police Department located Bone and escorted him to the police station to be interviewed. When questioned and read his Miranda rights, Bone refused to sign a Miranda waiver or to turn over his "Chuck Taylor" shoes, which were of particular interest to police given shoeprint evidence taken from the crime scene. During his initial interview, which lasted roughly an hour and a half, Bone denied involvement in the burglary and

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

2

murder. Detective Saul then ended the interview, placed Bone under arrest, and arranged for Bone to be taken before a magistrate so that an arrest warrant could be issued.

After Bone was served with the arrest warrant, he told a uniformed officer that he wanted to speak with Detective Saul again. At Bone's request, Detective Saul escorted Bone to the interview room, where Saul again read the Miranda rights to Bone. As he read each provision on the "Statement of Rights" form, Detective Saul asked Bone if he understood that provision. After Bone verbally indicated that he understood, Detective Saul checked off each provision. Bone then signed the Statement of Rights and a written Waiver of Rights, which provided above his signature:

> I have read the above statement of my rights and also had my rights explained to me by a police officer. Knowing these rights, I do not want a lawyer at this time. I waive these rights knowingly and willingly and agree to answer questions and/or make a statement.

J.A. 2347. After signing the form, Bone told Detective Saul "[s]ome people need to be in prison," and made a statement which was written down by Detective Saul and signed by Bone. J.A. 2493. The statement read as follows:

> This statement is given freely and I told Det. Saul I wanted to talk to him after the warrant for murder had been read to me. On Saturday 8-23-97 sometime after dark I broke into an apartment. The reason I did this was because I had been smoking crack. I was out of money and needed some more to buy some more crack. I was in Smith Homes during this time. I was walking

3

behind some apts on Rockett St when I noticed a window opened. I cut the screen with a pocket knife, then I crawled in through the window. This led into the kitchen. After I got in I looked around in the living room and didn't see anything. Then I saw a radio in the kitchen on the counter. I laid it on the floor. Then I walked into the bedroom and saw this white lady in bed asleep. Right when I walked in the bedroom she woke up and said what are you doing in here. I said I just want money I'm not going to hurt you. She keep saying what are you doing in here, I was afraid she was going to start yelling so I ripped the curtain off the wall and rolled her over on her stomach and tied her hands behind her back then tied her feet. I had to take the curtain rod out of the curtain before I did this. She was still trying to get up and still I was afraid someone was going to hear her so I put my hands on her neck to try to hold her head down to keep her quiet and so she would not look at me. Then I tied a piece around her mouth for a gag. Then I saw her pocketbook in the bedroom. I took it along with a flashlight she had lying on her dresser into the living room. I dumped out the pocketbook on the floor and didn't find anything. While I was doing this she had been making funny noises. I went in and looked at her and she was bleeding. Then I noticed that the bedroom window could be looked through from the outside. I took a white blanket off her bed and hung up over the window so nobody could see in. When I left I unplugged the phone and left out the back door taking only her flashlight, I decided not to take the radio. After I left there I went down to another apt. The screen was already cut so I raised the window and climbed in. This was in a bathroom. When I walked around the apt I saw an old black man sleeping in a chair in the living room. On a chair was a pair of pants and inside the pants pocket was a wallet, I took this into the bedroom and dumped everything out. There was about 8 or 9 dollars and I took it and went out the window I came in through. I walked through the path to the Center and then all the way to Shamberger's Store on Eugene St. Then I bought a $5.00 rock and smoked it. Last month I told Paul Blackmon that I might have killed somebody. Paul just looked at me and didn't say anything. In closing I would like to say that I am deeply sorry and I know I've brought a lot of grief on the family but I was on drugs when

4

this happened and I wish I didn't abuse the drugs like I do. I'm not a bad person. In time I hope you can find forgiveness. Signed Anthony Bone, R.W. Saul, 10/8/97 at 1500 hours.

J.A. 2732-33.

A jury in Guilford County, North Carolina convicted Bone of the first-degree murder of Ethel McCracken and two counts of first-degree burglary. Bone received a sentence of death plus two consecutive terms of 146-185 months' imprisonment, which was later converted to a sentence of life after the North Carolina courts determined Bone was mentally retarded under North Carolina law. Bone also filed a motion for appropriate relief ("MAR") contending, among other things, that his trial counsel failed adequately to investigate and present evidence that his confession was obtained in violation of his Fifth Amendment rights. Bone's MAR, and a subsequent petition for review to the state court of appeals, were denied.

In October 2004, Bone filed a § 2254 habeas petition in the Middle District of North Carolina. After conducting an evidentiary hearing, the district court denied Bone's petition and issued a certificate of appealability as to Bone's claim "that he did not knowingly and intelligently waive his Miranda rights and that his trial counsel was ineffective in failing to raise this issue in state court." Bone appealed, and we have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(c)(1).

5

Where (as here) a petitioner's claims are adjudicated on the merits in state court, we may grant habeas relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); Cummings v. Polk, 475 F.3d 230, 237 (4th Cir. 2007). But even if we so find, we may only grant relief after "review[ing] [the] state court judgment[] independently to determine whether issuance of a writ is warranted." Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001).

In resolving Bone's petition, we assume without deciding that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law. . . ." 28 U.S.C. § 2254(d); see also Golphin v. Branker, 519 F.3d 168, 189-90 (4th Cir. 2008) (finding unnecessary to consider whether the state court unreasonably applied federal law because any error did not have a prejudicial effect); Bauberger v. Haynes, 632 F.3d 100, 103 (4th Cir. 2011) (same; noting that by doing so "we avoid wasting the parties' and the courts' limited resources on 'questions that have no effect on the outcome of the case.'") (quoting Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)). We therefore review the record de novo to

determine whether issuance of the writ is warranted; that is, whether Bone knowingly and intelligently waived his Miranda rights. See Rose, 252 F.3d at 689-90.

                                III

To be valid, a waiver of Miranda rights must have been (i) "voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception"; and (ii) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[2] Moran v. Burbine, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." United States v.

---

[2] The district court's certificate of appealability applies only to Bone's claims "that he did not knowingly and intelligently waive his Miranda rights and that his trial counsel was ineffective in failing to raise this issue in state court." We therefore limit our discussion to those issues, and do not address whether Bone's waiver was voluntary. See Appleby v. Warden, 595 F.3d 532, 535 n.3 (4th Cir. 2010) ("[B]ecause this court is empowered to consider only the specific issue or issues set forth in the certificate of appealability, we will not consider [additional] issues.") (quoting United States v. Linder, 561 F.3d 339, 344 n.6 (4th Cir. 2009) (internal quotations omitted)).

Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (quoting Moran, 475 U.S. at 421).

When evaluating the totality of the circumstances for the purposes of determining the validity of a Miranda waiver, we consider factors such as a defendant's "intelligence and education," his "age and familiarity with the criminal justice system, the proximity of the waiver to the giving of the Miranda warnings," and whether he "reopened the dialogue with the authorities." Poyner v. Murray, 964 F.2d 1404, 1413 (4th Cir. 1992) (citations omitted). "In cases involving defendants with low intellectual ability, the knowingness of the waiver often turns on whether the defendant expressed an inability to understand the rights as they were recited." United States v. Robinson, 404 F.3d 850, 861 (4th Cir. 2005). In such circumstances, a defendant's "below average I.Q. does not make him per se incapable of intelligently waiving his rights." Id.

A

Bone argues he was incapable of knowingly and intelligently waiving his Miranda rights due to his diminished mental capacity. In support of his argument, Bone points out that he has an I.Q. of 69; has established that he is mentally retarded under North Carolina law; and that the state MAR court found that he had "difficulties [] comprehending and expressing

8

information including [an] inability to give directions, [a] need to have things explained to him repeatedly, [] poor understanding of others, and [] limited reading and writing skills." J.A. 49. Additionally, Bone presents the affidavit of Dr. Olley, previously submitted to the MAR court, which avers Bone "demonstrated a very limited understanding of his Miranda rights" when he was tested roughly four years after his waiver; Bone's confession was "written at a reading level at which Mr. Bone would have difficulty understanding"; and "there are many indicators that Mr. Bone in fact did not understand the waiver of rights that was presented to him and that he signed." J.A. 125, 127, 130.

The evidence presented by Bone, however, is eclipsed by the evidence contemporaneous to his confession which indicates that he knowingly and intelligently waived his Miranda rights. Bone indicated he understood that he did not have to speak to police when, during his first interaction with Detective Saul, he denied involvement in the crime and refused to sign a waiver. He initiated—without prompting—the second interview by asking an officer if he could again speak with Detective Saul. Bone then demonstrated his understanding of the consequences of the decision to abandon his Miranda rights when he began the second interview by saying "[s]ome people need to be in prison." J.A. 2493. And, as Saul reviewed the Miranda rights with Bone prior

9

to questioning him, Bone acknowledged that he understood each provision as it was read to him and then signed an acknowledgement and waiver of his rights before confessing.[3] Given these circumstances, Bone's I.Q. does not preclude a determination that his Miranda waiver was valid. See Cornell v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995) (finding waiver knowing, voluntary, and intelligent where a defendant with an I.Q. of 68 had previous experiences with law enforcement and received numerous Miranda warnings); Robinson, 404 F.3d at 861 ("Although Robinson admittedly has a low I.Q. [70] and several mental disorders, nothing in the record indicates that Robinson could not understand the rights as Agent Hicks provided them. To the contrary . . . Robinson was 'street smart' and understood his Miranda rights.").

It is thus clear from the record that Bone understood "that he may choose not to talk . . ., to talk only with counsel present, or to discontinue talking at any time." Colorado v. Spring, 479 U.S. 564, 574 (1987). In light of the totality of the circumstances, Bone understood these fundamental concepts

---

[3] In addition, Bone (1) had "familiarity with the criminal justice system," Poyner, 964 F.2d at 1413, demonstrated by his two previous arrests and guilty pleas, J.A. 2773; and (2) signaled his prior experience with the criminal justice system when he refused to surrender his shoes to Detective Saul during earlier questioning.

when he waived his Miranda rights; hence, his decision to waive those rights was made both knowingly and intelligently.

B

To establish ineffective assistance of counsel under the familiar standard of Strickland v. Washington, 466 U.S. 668 (1984), a criminal defendant must show that his counsel's representation "'fell below an objective standard of reasonableness,' and . . . that 'the deficient performance prejudiced the defense.'" United States v. Cooper, 617 F.3d 307, 312 (4th Cir. 2010) (citing Strickland, 466 U.S. at 687–88). Where, as here, a Sixth Amendment claim rests on trial counsel's failure to move to suppress evidence, establishing actual prejudice requires the petitioner to establish that the underlying claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence. See, e.g., United States v. Cieslowski, 410 F.3d 353, 360 (7th Cir. 2005) ("When the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, we have required that a defendant prove the motion was meritorious."); Kimmelman v. Morrison, 477 U.S. 365, 375 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his

11

Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence.").

Bone cannot establish prejudice under Strickland because, as explained above, the Miranda issue which he contends should have been presented at trial is without merit. Because Bone fails to establish prejudice, it is not necessary for us to analyze whether his trial counsel's performance fell below an objective standard of reasonableness. McHone v. Polk, 392 F.3d 691, 704 (4th Cir. 2004) ("If McHone fails to demonstrate sufficient prejudice from certain acts or omissions, we need not decide whether counsel's performance in those respects was, in fact, deficient under Strickland." (citing Strickland, 466 U.S. at 694)).

IV

For the foregoing reasons, we affirm the judgment of the district court.[4]

AFFIRMED

---

[4] The Court wishes to express its appreciation to Mr. James Donald Cowan for the very fine argument he gave on behalf of appellant in this case.

12